**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

RECEIVED, CLERKS OFFICE
2013 MAR 11 AM 11 33
US DISTRICT CT COLA, SC

| | | |
|---|---|---|
| John A. Nell and Rebecca L. Nell, wife<br>Plaintiffs<br><br>v.<br>Wieland Financial Services, LLC<br>Northstar Mortgage Group, LLC<br>John Wieland, Dave Sander, Beth Loftis,<br>Sabadell United Bank, and subsidiary<br>VirtualBank<br>John and Jan Does 1-10<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. ______________ |

---

## BREACH OF CONTRACT ACTION

PLAINTIFFS WILL SHOW THAT DEFENDANTS HAVE WILLFULLY, WITH MALICE AND AFORETHOUGHT, ENGAGED IN BREACH OF MORTGAGE CONTRACTS OFFERED, AGREED UPON, EXECUTED, AND DELIVERED BY DEFENDANTS TO PLAINTIFFS. DEFENDANTS' ACTIONS AGAINST PLAINTIFFS AMOUNTS TO NOTHING LESS THAN CRIMINAL FINANCIAL TERRORISM, BY FALSELY AND DECEITFULLY MISREPRESENTING THE STATED TERMS OF MORTGAGE CONTRACTS, IN THAT, AT ALL MATERIAL TIMES TO THIS COMPLAINT, DEFENDANTS REPRESENTED THEMSELVES AS "LENDERS" OF MONEY; AND ALSO REPRESENTED THAT PLAINTIFFS WERE TO BE "BORROWERS" OF MONEY. BUT THIS ACTION WILL SHOW THAT DEFENDANTS NEVER DID "LEND" ANY MONEY TO PLAINTIFFS, AND THAT PLAINTIFFS NEVER DID "BORROW" ANY MONEY FROM DEFENDANTS. BUT RATHER, DEFENDANTS CONSPIRED TO UNLAWFULLY "CREATE" MONEY, NOT "LOAN" MONEY. FURTHER, THIS ACTION WILL SHOW THAT THE ONLY VALUABLE CONSIDERATION PROVIDED FOR THE TRANSACTION WAS DERIVED FROM THE CONTRACTUAL NOTES DEPOSITED IN ACCOUNTS AS MONEY. DUE TO THE UNLAWFUL CREATION OF MONEY, PLAINTIFFS WERE CHARGED "INFINITE INTEREST" TO THEIR FINANCIAL, EMOTIONAL, AND PHYSICAL DETRIMENT, ALL DUE TO DEFENDANTS BREACHING THE STATED TERMS OF THEIR CONTRACTS.

**COMES NOW**, Plaintiffs, John A. Nell and Rebecca L. Nell, and files this Breach of Contract Action against Defendants, regarding mortgage transaction contracts that Defendants' offered, agreed upon, executed, and delivered to Plaintiffs' involving Plaintiffs' real property, and in furtherance thereof, states as follows:

## I. <u>STATEMENT OF JURISDICTION</u>

1. This Court possesses original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343, and supplemental jurisdiction over Plaintiff's State Claims, pursuant to U.S.C. §1367.

2. This Court has authority to award Plaintiffs damages under 28 U.S.C. §1343(a) (1) (2)(3)(4).

3. This Court has the authority to award the requested Injunctive Relief, under Rule 65, of the Federal Rules of Civil Procedure, and pursuant to 28 U.S.C. §2202 and 1343(a)(3).

4. The Plaintiff's aver venue is proper under 28 U.S.C. §1332for this Court has jurisdiction over the parties because diversity of the parties and the controversy is in excess of $75,000.00.

5. This Court has the authority to issue the requested Declaratory Relief, pursuant to 28 U.S.C. 2201 and, further defined under Rule 57, of the Federal Rules of Civil Procedure.

6. Plaintiff will comply with the suggested "ORDER" form that within 25 days the Plaintiff will submit to this Court with specificity the list of defendants and what particular violations and wrongdoings and all other predicate acts including and not

limited to dates and the participants of each predicate act and a description of the facts constitution each predicate act in compliance with Federal Rule of Civil Procedure 9(b).

7. The Rico Case Statement will address the predicate acts under 18 U.S.C. §1962(a); 1692(b); 1962(c) and 1692(d).

8. Plaintiffs will also discuss with specificity the injury to the business or property and to the well-being of the Plaintiffs.

9. Additionally an outline of additional information including and not limited to at least three expert witnesses, one or two lay witnesses, as that would be helpful in this Courts understanding.

10. Plaintiffs ask this honorable Court sufficient time to allow for amending this Complaint and discovery to aid the Plaintiff in ascertaining the facts of this case.

## II. THE PARTIES

11. The Plaintiffs are John A. Nell and Rebecca L. Nell, wife (hereinafter referred to by their individual name(s) where appropriate, or when referred to collectively will be "Plaintiffs"), whose address is 695 Marvin Meadows Road, Fort Mill, South Carolina 29707.

12. The Plaintiffs' real property that is the subject of this Breach of Contract Action is located at 21 South Forest Beach Drive, Hilton Head Island, South Carolina, 29928 (referred to herein as "Plaintiffs' real property").

13. Defendant Wieland Financial Services, Inc. (hereinafter referred to as "WFS") is incorporated under the laws of the state of Georgia, with its principle place of business located at 4125 Atlanta Road SE, Smyrna, GA 30080.

14. Defendant Northstar Mortgage Group (hereinafter referred to as "NMG") is incorporated under the laws of the state of Georgia, with its principle place of business located at 3350 Riverwood Parkway, Suite 1900, Atlanta, GA 30339.

15. Defendant John Wieland, who residential address is 3245 Nancy Creek Rd, Atlanta, GA 30327, is the owner / operator / chief executive of Wieland Financial Services, Inc. and his business address is 4125 Atlanta Road SE, Smyrna, GA 30080.

16. Defendant Dave Sander, whose residential address is 2930 Perrington Ct, Marietta GA 30066, and his business address is Rennasant Bank, 2001 Park Place North, Suite 650, Birmingham AL 53203, was President of Defendant WFS from February 1985 to September 2005. ("Defendant Sander" may also be referred to herein as "Sander of WFS" when his actions complained of are averred to be connected to Defendant WFS.)

17. Defendant Dave Sander was also owner, President, and otherwise executively connected to Defendant NMG from on or about 2005 to on or about 2009. ("Defendant Sander" may also be referred to herein as "Sander of NMG" when his actions complained of are averred to be connected to Defendant NMG.)

18. Defendant Beth Loftis, whose residential address is 8817 Lillington Circle, Montgomery AL, 36117, and her business address is BB&T, 2000 Interstate Park Drive,

Suite 400, Montgomery AL 36109, was a loan officer with Defendant WFS. ("Defendant Loftis" may also be referred to herein as "Loftis of WFS" when her actions complained of are averred to be connected to Defendant WFS.)

19. Defendant Beth Loftis was also a loan officer and general partner of Defendant NMG. ("Defendant Loftis" may also be referred to herein as "Loftis of NMG" when her actions complained of are averred to be connected to Defendant NMG.)

20. Sabadell United Bank and its subsidiary VirtualBank, which it acquired through merger and/or acquisition having a listed business office at 1111 Brickel Bay Drive, Miami, FL. 33131.

21. Mr. Mario Trubea, President/CEO of Sabadell Bank whose address is 1111 Brickell Bay Drive, Miami FL 33131 is directly responsible for the actions of VirtualBank under the Doctrine of Respondeat Superior and Apparent authority.

22. Defendants John and Jane Does 1-10 (referred to as "the Doe Defendants"), whose identities are yet to be discovered by Plaintiffs, Plaintiffs reserve the right to petition the Court to amend the Complaint to include such defendants as indispensable parties when their true identities have been ascertained within appropriate time frames.

## III. BACKGROUND

## GENERAL OVERVIEW OF DEFENDANTS' INVOLVEMENT

23. At all times material to this action, Defendant WFS, by and through Defendant John Wieland, acted in a respondeat superior, apparent authority, and maintenance and champerty relationship, in that said Defendants dictated, governed, managed, engineered, and ordered the conduct of its employees named in this action, and the Doe Defendants not yet named or discovered, to engage in the deceptive (criminal) illusion of "lending" money, when in fact no money was ever lent to Plaintiffs contrary to WFS contracts specifying that WFS was to be the "lender" of money to Plaintiffs.

24. At all times material to this action, Defendant NMG, by and through Sander and Loftis of NMG, acted in a respondeat superior, apparent authority, and maintenance and champerty relationship, and governed, managed, engineered, and ordered the conduct of its employee-defendants named in this action, and the Doe Defendants not yet named or discovered, to engage in the deceptive (criminal) illusion of "lending" money, when in fact no money was ever lent to Plaintiffs contrary to NMG contracts specifying that NMG was to be the "lender" of money to Plaintiffs.

25. Plaintiffs were led to believe that the new contractual agreements of (alleged) Loan #BL060320000 with NMG was to be used to pay off[1] the two previous contractual agreements with WFS designated Loan #115683340.

---

[1]Another false misconception concerning banking is that when payments are made on any account the banks do not record the payments by increasing their assets by debiting their cash or by crediting their net worth or owner equity as would be needed to prove the validity or the very existence of a real loan. Two former advisors to the Federal Reserve Board of Governors, both having PhD's, one a former Chief of the Domestic Research Division of the Federal Reserve Bank of New York, a consultant to the United States Treasury and the Federal Deposit Insurance Corporation and the other a former Senior Staff Economist with the President's Council of Economic Advisors and a consultant to the Federal Reserve System and the Federal Loan Bank Board and HUD wrote in their Book entitled "PRINCIPLES OF MONEY, BANKING, AND FINANCIAL MARKETS." (EXHIBIT 20) Page 28, "When

26. At all times material to this action, Defendants Sander and Loftis acted as authorized agents, representatives, and/or associates through their respective deceitful involvements with both WFS and NMG, to collectively engage in deliberately false contractual representations which they knew were deliberate and false, by concealing material facts to Plaintiffs, through non-disclosure, underlying the true nature that there was to be no "lending" of money to Plaintiffs for the mortgage contracts as offered, agreed upon, executed, and delivered to Plaintiffs by said Defendants, involving Plaintiffs' real property located in Hilton Head Island.

27. On or about November 21, 2005 Defendant Sander, Defendant Loftis, Defendant Wieland, Defendant Wieland Financial Services knew or should have known that Wieland Financial Services was going to bifurcate the alleged loan (#115683340) without the knowledge of Plaintiffs and illegally monetize[2] (monetization of credit)[3] the promissory and mortgage notes for their face value of the Plaintiff's executed Notes as the only source of funding by issuing a check by debiting a bank's asset

---

someone repays a bank loan, the bank has less loans outstanding, and at the same time deducts the same amount from the borrower's demand deposit balance. There are less demand deposit in existence; money has disappeared." This proves that by producing the general ledgers of a bank will prove that a loan was never given but proves that the Bank owes the depositor for his deposit of the value of the promissory note. How can any Court challenge the information contained in this suit and especially the credentials of Ritter and Silber? Contrary to thinking that the payment of loans reduce the supply of money causing even greater recessionary tendencies and bank does not lose the principle amount for it never loan any money in the first place.

[2] The Federal reserve System's Board of Governors creates and publishes a book since May 1939 (13 editions to date) entitled The Federal Reserve System, Purposes & Functions and explains the definition of "monetization "as "action by a central bank to purchase an object that is not money (for example, gold) that has the net effect of increasing bank reserves and permitting an increase in the money stock." Webster's New Collegiate Dictionary defines the term monetization as, "to coin into money". When the WFS accepted the promissory and mortgage note of the Plaintiffs, WFS monetized the promissory note and deposited the value of the promissory note into WFS asset account thus increasing the assets of WFS.

[3] EUGENE Elise, Ph. D. Professor of Economics, University of Miami wrote in his book entitled. "Money and Banking" on Page 116 or (See exhibit 1-2 Page 5 of 5, "MONITIZATION OF CREDIT" In accepting the notes of its customers and supplying in exchange its own notes, a bank profited because it paid no interest on its notes but charged interest on the notes signed by the borrowers.

account and crediting John A. & Rebecca L Nell's demand deposit account thus breaching the terms and conditions of the contract.[4] (SEE Exhibit 19-3 a book written by three economics professors (PhDs) from the Wharton School of Finance and Commerce, University of Pennsylvania also supports the allegations made in this Complaint).

28. At all times material to this action, each named Defendant, and those not yet named, willingly facilitated the commission of Breach of Contract involving mortgage contracts offered, agreed upon, executed, and delivered to Plaintiffs by the named Defendants, by knowing full well they were not going to honor the black-letter wording of the contractual mortgage agreements specifying WFS and NMG as "lender(s)" and Plaintiffs as "borrowers" within the four corners of said contracts, when each contract detailed that there was to be a "loan" of money to Plaintiffs when a "loan" of money was never intended, because Defendants knew that there would be no valuable consideration of any kind transferred from any accounts of WFS or NMG to Plaintiffs in

[4]Charles, R. Whittlesey (PhD), Arthur M. Freedman(PhD) and Edward S. Herman (PhD), Economic finance professors from the Wharton school of Finance and Commerce from the University of Pensylvania explains "The lending process and the Creation of Derivatives Deposits" and monetization on the promissory note through the lending process on page 84 and 85 of Exhibit 19-3. Entitled "Money and Banking: Analysis and Policy". On page 84 it reads, "Let us now suppose that a businessman, needing funds to acquire a stock of inventory, asks the Mephisto Bank for a loan of $25,000.00. After the loan is granted, the balance sheet of the Bank would show a $25,000.00 addition to Bank's assets in the form of notes receivable, and an equivalent must use addition to the deposit liabilities of the Bank." When the Bank's liabilities are credited the Bank to be in compliance with General Accepted Accounting Principles must credit demand deposits as in agreement with the Plaintiff's Complaint. Exhibit 19-3 supports Exhibit 1 and Exhibit 2 on page 85 in the second paragraph, "It will be noted that this transaction results in an increase in the money supply since demand deposits have risen without any offsetting change elsewhere in the system. In other words, the bank loaned money that it created in the very process of lending. This process of money creation is sometimes referred to as the "monetization of credit," as the credit instrument of the borrower (promissory note) has been converted into money by its exchange for the newly created derivative deposit." The mortgage was breached through fraudulent conversion when the agreement only permits that the Note may be transferred, the Note does not allow for a fraudulent conversion process. To simplify what really happened is nothing more than the Bank giving five one dollar bills for a one five dollar bill and call it a loan and collect interest. Exhibit 19-3 on the top of page 85 verifies this simple example, "The Bank has exchanged its own non-interest debt for an interest –bearing obligation of its customers."

any of the mortgage contracts involving Plaintiffs' real property located in Hilton Head Island.

29. Instead of "lending" money to Plaintiffs according to the black-letter terms of the mortgage contracts of WFS and NMG delivered to Plaintiffs by human Defendants, money was "created" as "counterfeit" money through ledger bookkeeping entries[5] (See Exhibit3 page 6 of 8) that were not disclosed to Plaintiffs as part of the transaction.

30. Without evidence of money "lent" to Plaintiffs by way of diminution in WFS's and NMG's total value of Net Worth, Defendants' recourse to this action is untenable.

31. Insofar as the burden of proof is concerned in this matter, which Plaintiffs can only carry so far through attached exhibits, depositions and discovery documents that will be sought from Defendants, burden also falls on WFS and NMG to produce books and ledger accounts revealing their Net worth or owners equity, with this being so, Plaintiffs believe that this Court must adhere to the precedent set by the U.S. Supreme Court in the matter of Campbell v. U.S., 365 US 95 (1961), in which the High Court asserted:

> "[t]he ordinary rule, based upon the considerations of fairness, does not place the burden upon a litigant of establishing facts peculiar within the knowledge of his adversary. United States v. New York, N.H. & H.R. Co., note 5." *Id.*, at p. 96.

[5] Professor McConnell writes in his book entitled, "Economics" "The President of the Grisley Company hands a promissory note- a high class IOU-to the Wahoo Bank. "From the Wahoo Bank's standpoint it has acquired an interest-earning asset (the promissory note)'and has created demand deposits to pay for this asset. ... "the Grisley Company and the Wahoo Bank have created and then swapped claims." ..."the Grisley Company went to the Bank with something which is not money-his IOU-and walked out with something that is money-a demand deposits,"...the Wahoo Bank has "monetized" an IOU."...The Grisley Company and the Wahoo Bank have created and then swapped claims."

(*See also*, the 6th Circuit's ruling in 763 F.2d 188 (1985) (relying on J. Wigmore, Evidence in Trials at Common Law, § 2486 at 290 (rev. 1981), when the Court said: "A guiding principle is to assign the burden to the "party who presumably has peculiar means of knowledge enabling him to prove its falsity if it is false."" -- that proof would be on the Defendants through books and ledger accounts to show the decrease in Net worth in order to prove Plaintiffs' claims are false.)

32. Plaintiffs believe that the books, records, and account ledgers of Defendants WFS and NMG **"will"** resemble Chart No. 1 below, which shows no change in the Generally Accepted Accounting Principles (GAAP) T-account ledger column for Net Worth when recording the dishonest loan (using $50 as the alleged loan amount) that Defendants pulled on Plaintiffs, to wit:

## CHART NO. 1

### GAAP BOOKEEPING ENTRIES FOR "DISHONEST" LOAN OF $ 50

| | ASSETS IN CASH | | = | LIABILITIES IN CHECKING DEMAND DEPOSITS | | + | BANK'S / LENDER'S NET WORTH | |
|---|---|---|---|---|---|---|---|---|
| | Debits | Credits | | Debits | Credits | | Debits | Credits |
| Step 1. | $ 100 | | | | $ 0 | | | $ 100 |
| | | | = | | | + | | |
| Step 2. | $ 50 | | | | $ 50 | | | $ 100 |
| | | | = | | | + | | |
| Step 3. | $ 150 | | | | $ 50 | | | $ 100 |

**Step 1 – Beginning balances.**

**Step 2 – Promissory note is "monetized" by lender by depositing into Assets, then "swapped" by lender for an equal value Demand Deposit Checking account for borrower's use. Thus, money Was "created" by lender using value of borrower's note(s), which is borrower's promise to pay. (This is "counterfeiting" of currency as money, plain and simple.)**

**Step 3 – Ending balances…Assets and Liabilities increase by $50 each of newly "created" (counterfeited) money -- no loan was given -- Net Worth is left <u>unchanged</u> -- "loan" documents do <u>not</u> support this transaction. The lender merely did an "even exchange" through undisclosed "counterfeiting" and called this transaction a loan when there was <u>no</u> <u>real</u> <u>loan</u>.**

33. Plaintiffs further believe that the books, records, and account ledgers of Defendants WFS and NMG **"<u>should</u>"** resemble Chart No. 2 below, which shows an absolute negative change in the Generally Accepted Accounting Principles (GAAP) T-account

column for Net Worth when making an honest loan (using $50 as the alleged loan amount) of the lenders own money property, to wit:

## CHART NO. 2

### GAAP BOOKEEPING ENTRIES FOR "HONEST" LOAN OF $ 50

| | ASSETS IN CASH | | | LIABILITIES IN CHECKING DEMAND DEPOSITS | | | BANK'S / LENDER'S NET WORTH | |
|---|---|---|---|---|---|---|---|---|
| | Debits | Credits | = | Debits | Credits | + | Debits | Credits |
| **Step 1.** | $ 100 | | | | $ 0 | | | $ 100 |
| | | | = | | | + | | |
| **Step 2.** | | $ 50 | | | $ 0 | | - $ 50 | |
| | | | = | | | + | | |
| **Step 3.** | $ 50 | | | | $ 0 | | | $ 50 |

**Step 1 – Beginning balances.**

**Step 2 – Subtract the $50 actually loaned from Net Worth.**

**Step 3 – Ending balances…Net Worth is reduced by the amount of the "honest" loan -- "loan" documents do support this transaction.**

**WHEREFORE,** Plaintiff asks this honorable Court to allow the opportunity for the Plaintiff to have the aid of discovery in order to ascertain the current violations and additional violations in order to file an amended Complaint and ask this Court for

leniency in order for Plaintiffs to rectify any possible defects in this Complaint in the name of justice and the Plaintiff's right to have their Complaint heard.

## IV. COUNT I

## FACTUAL BACKGROUND ALLEGATIONS

34. On or about November 21, 2005, by and through Sander of WFS and Loftis of WFS, Plaintiffs were notified that WFS had approved a loan sought by Plaintiffs in the amount of five hundred thousand dollars ($500,000.00), at an annual interest rate of one percent (1%) of the unpaid balance.

35. The loan, as offered and approved by WFS by and through Sander and Loftis of WFS, was against the equity in Plaintiffs' real property located in Hilton Head Island.

36. The $500,000.00 (alleged) loan to Plaintiffs by WFS was assigned Number 115683340 under contractual agreements via Adjustable Rate Note and Mortgage Note delivered to Plaintiffs by WFS on or about November 21, 2005. (*See* **Exhibit "A"** for a true and correct copy of Adjustable Rate Note and Mortgage Note delivered to Plaintiffs by WFS.)

37. Since WFS's mortgage documents of Exhibit "A" did not provide special definitions for the words "lend," "lender," "borrow," "borrower," and "loan," contract law dictates such words must possess common every day English language definitions.

38. Plaintiffs were led to believe through representations by WFS Defendants along with the contractual mortgage agreements of Exhibit "A" that WFS was to "lend" Plaintiffs $500,000.00.

39. The common English language definitions of "lend" are:

> "to let out (money) for temporary use on condition that it be repaid with interest at an agreed time; to give into another's keeping for temporary use on condition that the borrower return the same or its equivalent; temporary possession and use by a borrower"

40. Plaintiffs were led to believe through the contractual mortgage agreements of Exhibit "A" that WFS's stated role was the "lender" of $500,000.00 to Plaintiffs.

41. The common English language definition of "lender" is: "one that lends".

42. Plaintiffs were led to believe through the contractual mortgage agreements of Exhibit "A" that Plaintiffs were to "borrow" $500,000.00 from WFS.

43. The common English language definition of "borrow" is:

> "to receive, appropriate, or derive something (as by way of a loan) from another; to receive temporarily from another, implying or expressing the intention of either returning the thing received or of giving its equivalent to the lender; obtain for temporary use"

44. The common English language definition of "borrower" is: "one that borrows".

45. Plaintiffs were led to believe through the contractual mortgage agreements of Exhibit "A" that there was to be a "loan" of $500,000.00 to Plaintiffs borrowed from WFS.

46. The common English language definition of "loan" is:

> "money lent at interest; borrowed property; lend; to lend; grant; something lent for the borrower's temporary use on condition that, it or its equivalent be returned"

47. WFS's bookkeeping entries, account records and ledgers, <u>should</u> reveal a decrease of $500,000.00 in their Net worth account if WFS actually lent Plaintiff any money referenced as "loan" No. 115683340 that is set forth in the contractual document marked as Exhibit "A" as offered, agreed upon, executed, and delivered to Plaintiffs by WFS.

48. WFS's accounting ledgers will reflect that the Affidavits of, (See Plaintiff's Affidavits of Timmerman marked as Exhibit 11, Affidavit of Zajac, marked as Exhibit 12, the Affidavit of Barnes marked as Exhibit 13, to be filed as soon as Affidavits arrive and Plaintiff reserves his right to file these Affidavits as soon as possible and other Exhibits clearly marked as Plaintiff's Exhibit 2, page 2 of 5 and 3 of 5; Exhibit 3 page 6 of 8, 7 of 8 and 8 of 8; Exhibit 4, page 6 of 7, Exhibit 5, page 6 of 7 which states,

> "A bank that makes a loan monetizes a private debt by accepting as an asset the debt obligation of the borrower –that is, the borrower's promise to repay. The Bank simultaneously creates a liability on its books in the form of a demand deposit balance in the amount of the loan."

And Exhibit 5, page 6 of 7 which adds credibility to this complaint,

> "Suppose now that you, a substantial businessman on the island, go to the banker and ask to borrow, $1,000. Your credit is good, and he agrees to make the loan. What happens to the bank's balance sheet?" The answer is, "On the assets side "loans Outstanding go up $1,000 and on the liabilities side "Demand Deposits" go up the same amount."

And Exhibit 19-3 also agrees with the Plaintiff's Exhibit mentioned herein and yet to be mentioned state,

> "The lending Process and the creation of Derivative Deposits"
>
> Let us now suppose that a businessman, needing funds to acquire a stock of inventory, as the Mephisto State Bank for a loan of $25,000. After the loan is granted, the balance sheet of the bank would show a $25,000 addition to the bank's assets in the form of notes receivable, and an equivalent addition to the deposit liabilities of the bank.

MEPHISTO STATE BANK

| ASSETS | LIABILITIES/ DDA |
|---|---|
| Loans + $25,000 | Demand Deposits + $25,000 |

49. Plaintiffs' justifiable reliance for this action against WFS, John Wieland, and Sander, and Loftis of WFS, is based upon study of the attached exhibits authored by prominent economics professors of renowned universities, supported by the American Bankers Association and approved by the American Bar Association, revealing that money is not "loaned" by lending entities like WFS, but rather, money is "created" as "counterfeit" money through (fraudulent) lending processes, as the term "counterfeit" is defined in Barron's Business Guides, Dictionary of Banking Terms, Fourth Ed. (2000), ISBN 0-7641-1260-0, at page 112, to wit:

"COUNTERFEIT security, **currency**, or bank card made to appear genuine, **with the intention of defrauding an unsuspecting person**. Counterfeiting U.S. currency and bank cards is a felony under federal law, punishable by fines and prison terms. The U.S. Secret Service, a bureau of the Treasury Department, has responsibility for detecting and arresting counterfeiters." (All emphasis added.)

50. Without evidence of money "lent" to Plaintiffs by way of diminution in WFS's total value of its Net Worth, WFS's recourse to this action is untenable.

FOUNDATIONAL BACKGROUND - BREACH OF CONTRACT AGAINST WFS

51. WFS Defendants did not "loan" anything to Plaintiffs under the transaction it alleged as "loan" No. 115683340 of Exhibit "A", but rather, WFS Defendants concealed the fact that WFS "created" checkbook money by "monetizing"([6]) the full face value of the two contractual mortgage documents assigned No. 115683340 and "deposited" said "monetized" notes into an Asset account and simultaneously created a "demand deposit account" in a swap of value of said notes, which was the **only** valuable consideration for the demand deposit account, in which WFS then provided Plaintiffs with checks by which to draw on the full face values of their own notes causing Plaintiffs to think it was a real "loan" of money, when it in realty it was the fraudulent

---

[6] For purposes of this action, Plaintiffs' understanding of "monetize" is to *magically* (and criminally) turn something that is not money into money. (This is "counterfeiting," plain and simple.) The magic is supported by Webster's Third New International Dictionary (Unabridged), Copyright 1971 by G. & C. Merriam, Co., which defines "monetize" in Volume II (H-R), at p. 1458, in English language as: "to coin into money; **to create demand deposits in the banking system based upon assets or against debt instruments**". (All emphasis added.) The latter definition part is how the magic of lending takes place that caused WFS Defendants to breach their contracts, e.g., by "creating" demand deposits via checkbook money (counterfeiting) based upon or against "debt instruments," such as those in Exhibit "A".

and criminal creation of counterfeit currency money by use of Plaintiffs' valuable consideration derived from the notes assigned No. 115683340.

52. WFS did not "loan" any of its depositors' deposits to Plaintiffs under the transaction alleged by WFS as "loan" No. 11568334.

53. After WFS concealed that it monetized and deposited the notes of Exhibit "A" into a demand deposit account as Plaintiffs own valuable consideration for Plaintiffs' use as alleged "loan" No. 11568334, WFS further concealed that it intended to, and did in fact, "securitize" ([7]) said notes for sale as "loan sales" ([8]) into the stream of commerce while keeping the proceeds of such sale for WFS's unjust (and criminal) enrichment. WFS, by and through its officers and employees named herein as WFS Defendants John Wieland, Dave Sander, and Beth Loftis, breached the black-letter terms of the contracts offered and executed by Defendants in Exhibit "A", by not disclosing:

---

[7] For purposes of this action, Barron's Business Guides "Dictionary of Banking Terms," 4th Ed., by Thomas P. Fitch, Copyright 2000, Library of Congress Catalog Card No. 00-031164 (ISBN 0-7641-1260-0), Consulting Editors – Dr. Irwin L. Kellner, Chief Economist, *CBS MarketWatch*, Weller Professor of Economics, Hofstra University; and Donald G. Simonson, Anderson School of Management, University of New Mexico, in which the word "securitization" is defined on pp.412-413 as:

> "SECURITIZATIOIN **conversion** of bank loans and other assets into marketable securities **for sale to investors**. . . . By securitizing bank loans and credit receivables, U.S. financial institutions are able to remove bank assets from the balance sheet if certain conditions are met—boosting its capital ratios, and make new loans from the proceeds of the securities sold to investors. . . . As banks **look to investors as the ultimate holders of the obligations created by bank lending**, banks as an industry are inclined **to act more as sellers of assets, rather than portfolio lenders that keep all of the loans they originate in their own portfolio**. . . ." (Bold added.)

[8] For purposes of this action, the sale of Plaintiffs' alleged loan documents No. 115683340 by WFS through securitization amounted to "loan sales," which is defined in Barron's "Dictionary of Banking Terms" referenced *supra*, on p. 273, in pertinent part as: "LOAN SALES sale of loans or loan participations to an investor **without the knowledge of the borrower**. . . ." (Bold added.)

(1) the intention to "create money" in the form of a "demand deposit account" and use Plaintiffs' own valuable consideration via signed promissory note and mortgage note as the deposited money, instead of actually loaning money under the terms of the contracts;

(2) by not disclosing that Plaintiffs were to make payments on a "loan" that was never "lent" under the terms of the contracts;

(3) by not disclosing that Plaintiffs would be paying "infinite interest" on a "loan" that was never "lent" under the terms of the contracts;

(4) by not disclosing the intention to sell, and indeed did sell, the contracts of Exhibit "A" through "securitized" "loan sales";

(5) by not disclosing that WFS had every intention to retain, and indeed did retain the ill-gotten proceeds from the "securitized" "loan sales" of contracts of Exhibit "A" for WFS's unjust enrichment; and

(6) by not disclosing that if Plaintiffs failed to make payments on money that WFS had no intention of "loaning" in the first place, Plaintiffs would forfeit their real property located on Hilton Head, Island, South Carolina through (fraudulent) foreclosure.

54. WFS can not prove through its bookkeeping entries, account records, and account ledgers that its Net Worth diminished by $500,000.00 after alleged "loan" No. 115683340 was granted to Plaintiffs.

55. John Wieland cannot prove through WFS's bookkeeping entries, account records and ledgers, that WFS's Net Worth diminished by $500,000.00 after alleged "loan" No. 115683340 was granted to Plaintiffs.

56. John Wieland cannot prove through WFS's bookkeeping entries, account records and ledgers, that Plaintiffs ever received a "loan" of $500,000.00 after alleged "loan" No. 115683340 was granted to Plaintiffs.

57. Sander of WFS can not prove through WFS's bookkeeping entries, account records and ledgers, that WFS's Net Worth diminished by $500,000.00 after alleged "loan" No. 115683340 was granted to Plaintiffs.

58. Loftis of WFS can not prove through WFS's bookkeeping entries, account records and ledgers, that WFS's Net Worth diminished by $500,000.00 after alleged "loan" No. 115683340 was granted to Plaintiffs.

59. Sander of WFS can not prove through WFS's bookkeeping entries, account records and ledgers, that Plaintiffs ever received a "loan" of $500,000.00 after alleged "loan" No. 115683340 was granted to Plaintiffs.

60. Loftis of WFS can not prove through WFS's bookkeeping entries, account records and ledgers, that Plaintiffs ever received a "loan" of $500,000.00 after alleged "loan" No. 115683340 was granted to Plaintiffs.

61. The contractual mortgage agreements of Exhibit "A" that WFS, by and through Sander and Loftis of WFS, offered, agreed upon, executed, and delivered to Plaintiffs,

were knowingly "breached" by said Defendants, due to the fact that there is no evidence that the WFS Defendants, including John Wieland, can produce in order to prove that Plaintiffs received $500,000.00 from WFS in the form of a "loan" as the word "loan" is defined in common every day English language.

62. Without evidence of money "lent" to Plaintiffs by way of diminution in WFS's total value of its Net Worth, WFS Defendants' recourse to this action is untenable.

**WHEREFORE**, Plaintiff asks this honorable Court to allow the opportunity for the Plaintiff to have the aid of discovery in order to ascertain the current violations and additional violations in order to file an amended Complaint and ask this Court for leniency in order for Plaintiffs to rectify any possible defects in this Complaint in the name of justice and the Plaintiff's right to have their Complaint heard.

DEFENDANTS SANDER AND LOFTIS OF WFS TERMINATE THEIR EMPLOYMENT WITH WFS AND START THEIR OWN NEW COMPANY, NMG

63. Defendants Sander and Loftis of WFS terminated their employment with WFS on or about 2005.

64. Upon Defendants Sander and Loftis terminating their employment with WFS, they started their own new company called Northstar Mortgage Group, LLC (NMG).

65. Defendants Sander and Loftis of NMG contacted Plaintiffs on or about April 21, 2006, when it was relayed by said Defendants to Plaintiffs that WFS's loan transaction

No. 115683340 to Plaintiffs, which was arranged by Sander and Loftis while with WFS, was a faulty and defective loan and that Plaintiffs should consider a new "loan" with their newly formed NMG.

66. Plaintiffs never received the two (allegedly) paid off contractual agreements via Promissory Note and Mortgage Note with WFS upon being told by Defendants Sander of NMG and Loftis of NMG that the alleged loan would be paid off [9]with the new (alleged) Loan #BL060320000 with NMG and the original Promissory and Mortgage Notes would be returned and marked as "Paid as Agreed".

67. Through the advice and direction of Defendants Sander and Loftis with the newly formed NMG, Plaintiffs entered into a new "loan" transaction with NMG in the amount of five hundred six thousand, four hundred dollars ($506,400.00).

68. NMG assigned Plaintiffs' new loan transaction Number BL060320000 via delivery of an Adjustable Rate Note and a Mortgage Note to Plaintiffs. (*See* **Exhibit "B"** for a true and correct copy of Adjustable Rate Note and Mortgage Note delivered to Plaintiffs by NMG.)

---

[9] Another false misconception concerning banking is when payments are made on any account the banks do not record the payments by increasing their assets by debiting their cash or by crediting their net worth or owner equity as would be needed to prove the validity or the existence of a real loan or indebtedness. Two former advisors to the Federal Reserve Board of Governors, both having PH.D's, one a former Chief of the Domestic Records Division of the Federal Reserve Bank of New York, a consultant to the United States treasury and the Federal Reserve Insurance Corporation and the other a former Senior Economist with the President's Council of Economic Advisors and a consultant to the Federal Reserve System and HUD wrote in their Book, " entitled, "PRINCIPLES OF MONEY, BANKING, AND THE FINANCIAL MARKET'S." (EXHIBIT 20, Page 28, "When someone repays a bank loan, the bank has less loans outstanding, and at the same time deducts the same amount from the borrower's demand deposit balance. There is less demand deposit in existence; money has disappeared." This proves that the Bank owes the depositor for his deposit of the value of the promissory note and the security interest. The question is, how any court can challenge the information contained in this suit and the credentials of Ritter and Silber and all the other hundreds of reviewers and expert witnesses.

69. The loan offered and approved by Sander and Loftis of NMG to Plaintiffs was against the equity in Plaintiffs' real property located in Hilton Head Island.

70. Sander and Lofits of NMG informed Plaintiffs that NMG's newly arranged loan transaction No. BL060320000 was going to pay off Plaintiffs' loan No. 115683340 with WFS.

71. NMG has failed to return the original promissory and mortgage note held by WFS as required when NMG rewrote the WFS's loan thus deceiving Plaintiffs their notes back showing that the notes have been paid off. In Exhibit 5, page 155 Dr. Bach writes in his book entitled, "Economics" an Introduction to Analysis and Policy, Seventh Edition substantiate this very fact that the notes must be returned to the Plaintiffs and deducted from the Assets and Demand Deposit Account of the Plaintiffs:

" On the due date, you go in to see the banker and write him a check for the $1,000 . Exhibit 5 on page 7 of 7 Dr. Bach writes, that bank to not suffer any damage when the loan are not repaid but just reverses the accounting entries proving that banks and their attorney are once again misleading the courts.

"Someday your loan will come due. If you're a sound businessman, you will have built up your own checking account in preparation" …."On the due date, you go in to see the banker and write him a check for $1,000 on your own account. He (banker) returns your promissory note to you, and the loan is paid off. But look at what this does to the bank's balance sheet."…"Loans are down by $1,000, since the loan to you is paid off. And the deposits are down by $1,000, since you have written a $1,000 check against your account payable to the bank, and this check is not transferred to any other depositor". "Repayment of the loan just reverses the original entries that were made when (you) borrowed the money".[10]

[10] First item in dispute is that the bank never lent any of their own money by debiting their net worth account. In Exhibit 1 it states that banks do not lend other people's deposits Paragraph 3 on page 4 of 5 in Book Exhibit 1.

72. At all times relevant times to this Complaint, and based upon the Plaintiff's personal knowledge, information, understanding and beliefs, the Plaintiff hereby avers that the books and ledger account of WFS and NMG will show that Plaintiffs did not actually receive any valuable consideration from WFS for the (alleged) loan No.115683340.

73. The black-letter wording of the Adjustable Rate Note of Exhibit "B" delivered to Plaintiffs by NMG specified that Northstar Mortgage Group, LLC was the "lender" of a "loan," by stating as follows:

> "In return for the loan that I have received….., The Lender is **Northstar Mortgage Group, LLC.**" (Emphasis in original.)

(*See* Exhibit "B" for NMG's Adjustable Rate Note at ¶1, page 1 of 6 pages specifying NMG as the "Lender" of a "loan".)

74. NMG's Adjustable Rate Note of Exhibit "B" establishes Plaintiff, John A. Nell, as the "borrower" within the four corners of said document, in which it is announced below the signature line that the "borrower" is: "JOHN A. NELL—Borrower". (*See* Exhibit "B" for NMG's Adjustable Rate Note at signature line on page 6 of 6 pages specifying John A. Nell as the "Borrower.")

75. NMG's Mortgage Note of Exhibit "B" sets forth that the "Borrower" as stated in the DEFINITION section at "(B)" is: "JOHN A. NELL AND REBECCA L. NELL". (*See* Exhibit "B" for NMG's Mortgage Note.)

76. NMG's Mortgage Note of Exhibit "B" sets forth that the "Lender" as stated in the DEFINITION section at "(D)" is:

> "Lender" is NORTHSTAR MORTGAGE GROUP, LLC. Lender is a LIMITED LIABILITY COMPANY organized and existing under the laws of the State of GEORGIA. Lenders address is 3350 RIVERWOOD PARKWAY SUITE 1900 ATLANTA, GA 30339."

77. NMG's bookkeeping entries, account records and ledgers, should reveal a diminished Net Worth in the amount of $506,400.00 that NMG claimed to "lend" to Plaintiffs as "loan" No. BL060320000 as set forth in the contractual documents of Exhibit "B" that were offered, agreed upon, executed, and delivered to Plaintiffs by NMG.

78. The total and complete monetary value of NMG LLC must have been diminished by $506,400.00 that NMG claimed to "lend" to Plaintiffs as "loan" No. BL060320000, with discoverable evidence forthcoming from NMG, in order for NMG to succeed in defending against the instant Breach of Contract action.

79. Plaintiffs' justifiable reliance for this action against NMG, Sander and Loftis of NMG, is based upon study of the attached exhibits authored by prominent economics professors of renowned universities, supported by the American Bankers Association and approved by the American Bar Association, revealing that money is not "loaned" by lending entities like WFS, but rather, money is "created" as "counterfeit" money through (fraudulent) lending processes, as the term "counterfeit" is defined in Barron's Business Guides, Dictionary of Banking Terms, Fourth Ed. (2000), ISBN 0-7641-1260-0, at page 112, to wit:

> "COUNTERFEIT security, **currency**, or bank card made to appear genuine, **with the intention of <u>defrauding</u> an <u>unsuspecting</u> person**. Counterfeiting U.S. currency and bank cards is a felony under federal law, punishable by fines and prison terms. The U.S. Secret Service, a bureau of the Treasury Department, has responsibility for detecting and arresting counterfeiters." (All emphasis added.)

80. Without evidence of money "lent" to Plaintiffs by way of diminution in NMG's total value of its Net Worth, NMG Defendants' recourse to this action is untenable.

<u>FOUNDATIONAL BACKGROUND - BREACH OF CONTRACT AGAINST NMG</u>

81. NMG did not "loan" anything to Plaintiffs under the transaction it alleged as "loan" No. BL060320000 of Exhibit "B", but rather, NMG Defendants concealed the fact that NMG "created" checkbook money by "monetizing"([11]) the full face value of the two contractual mortgage documents assigned No. BL060320000 and "deposited" said "monetized" notes into an Asset account and simultaneously created a "demand deposit account" in a swap of value of said notes, which was the **<u>only</u>** valuable consideration for the demand deposit account, in which NMG then provided Plaintiffs with checks by which to draw on the full face values of their own notes causing Plaintiffs to think it was a real "loan" of money, when it in realty it was nothing more than an even exchange as proven by including and not limited to Exhibit "3" the that

---

[11] For purposes of this action, Plaintiffs' understanding of "monetize" is to *magically* (and criminally) turn something that is not money into money. (This is "an even exchange possibly even bordering upon counterfeiting.) The magic is supported by Webster's Third New International Dictionary (Unabridged), Copyright 1971 by G. & C. Merriam, Co., which defines "monetize" in Volume II (H-R), at p. 1458, in English language as: "to coin into money; **to <u>create</u> demand deposits in the banking system based upon assets or against debt instruments**". (All emphasis added.) The latter definition part is how the magic of lending takes place that caused NMG Defendants to breach their contracts, e.g., by "creating" demand deposits via checkbook money (counterfeiting) based upon or against "debt instruments," such as those in Exhibit "B".

the defendant(s) knew, should have known and withheld material facts that denied Plaintiff the chance to fully understand the true nature of the exchange of equal value. Which Plaintiff will support that Defendants Breach paragraph 1 of the Promissory Note by not lending Plaintiff's any valuable consideration or money to obtain the alleged negotiable instrument or loan number BL060320000.

82. NMG did not "loan" any of its depositors' deposits to Plaintiffs under the transaction alleged by NMG as "loan" No. BL060320000.

83. After NMG concealed that it monetized and deposited the notes of Exhibit "B" into a demand deposit account as Plaintiffs own valuable consideration for Plaintiffs' use as alleged "loan" No. BL060320000, NMG further concealed that it intended to, and did in fact, "securitize" ([12]) said notes for sale as "loan sales" ([13]) into the stream of commerce while keeping the proceeds of such sale for NMG's unjust (and criminal) enrichment.

---

[12] For purposes of this action, Barron's Business Guides "Dictionary of Banking Terms," 4th Ed., by Thomas P. Fitch, Copyright 2000, Library of Congress Catalog Card No. 00-031164 (ISBN 0-7641-1260-0), Consulting Editors – Dr. Irwin L. Kellner, Chief Economist, *CBS Market Watch*, Weller Professor of Economics, Hofstra University; and Donald G. Simonson, Anderson School of Management, University of New Mexico, in which the word "securitization" is defined on pp.412-413 as:

> "SECURITIZATION **conversion** of bank loans and other assets into marketable securities **for sale to investors**. . . . By securitizing bank loans and credit receivables, U.S. financial institutions are able to remove bank assets from the balance sheet if certain conditions are met—boosting its capital ratios, and make new loans from the proceeds of the securities sold to investors. . . . As banks **look to investors as the ultimate holders of the obligations created by bank lending**, banks as an industry are inclined **to act more as sellers of assets, rather than portfolio lenders that keep all of the loans they originate in their own portfolio**. . . ." (Bold added.) And furthermore the question should be asked is for the Defendants to prove that the Contract allows for the securitization of Plaintiff's notes in a unilateral fashion and then keeping the money for themselves when they can't prove that they had any rights to securitize the notes when the contract only states that they have the right to transfer the notes.

[13] For purposes of this action, the sale of Plaintiffs' alleged loan documents No. BL060320000 by NMG through securitization amounted to "loan sales," which is defined in Barron's "Dictionary of Banking Terms" referenced

84. NMG, by and through its officers and employees named herein as NMG Defendants Sander, Loftis and , breached the black-letter terms of the contracts offered and executed by Defendants in Exhibit "B", by not disclosing:

(1) the intention to "create money" in the form of a "demand deposit account" and use Plaintiffs' own valuable consideration via signed promissory note and mortgage note as the deposited money, instead of actually loaning money under the terms of the contracts;

(2) by not disclosing that Plaintiffs were to make payments on a "loan" that was never "lent" under the terms of the contracts;[14]

(3) by not disclosing that Plaintiffs would be paying "infinite interest" on a "loan" that was never "lent" under the terms of the contracts;

(4) by not disclosing the intention to sell, and indeed did sell, the contracts of Exhibit "B" through "securitized" "loan sales";

(5) by not disclosing that NMG had every intention to retain, and indeed did retain the ill-gotten proceeds from the "securitized" "loan sales" of contracts of Exhibit "B" for NMG's unjust enrichment; and

(6) by not disclosing that if Plaintiffs failed to make payments on money that WFS had no intention of "loaning" in the first place, Plaintiffs would forfeit

---

*supra*, on p. 273, in pertinent part as: "LOAN SALES sale of loans or loan participations to an investor **without the knowledge of the borrower**. . . ." (Bold added.)

[14] The burden of proof falls squarely on the backs of the Defendants to prove that they did not Breach the Contract, prove the lending of money, the right to use conversion, securitize and profiting hundreds of thousands of dollars at the financial detriment of the Plaintiff and the unjust enrichment of the Defendants.

their real property located on Hilton Head, Island, South Carolina through (fraudulent) foreclosure.

85. Neither NMG nor any NMG Defendants can prove through bookkeeping entries, account records and ledgers that NMG's Net Worth diminished by $506,400.00 after alleged "loan" No. BL060320000 was granted to Plaintiffs.

86. The contractual mortgage agreements of Exhibit "B" that NMG, by and through Sander, Loftis, and of NMG, as offered, agreed upon, executed, and delivered to Plaintiffs, were knowingly "breached" by said Defendants due to the fact that there is no evidence in existence that the NMG Defendants can produce in order to prove that Plaintiffs received $506,400.00 from NMG in the form of a "loan" as the word "loan" is defined in common every day English language.

87. Plaintiffs' justifiable reliance for this action against NMG and NMG Defendants, is based upon study of the attached exhibits authored by prominent economics professors of renowned universities, et al, supported by the American Bankers Association and approved by the American Bar Association, revealing that money is not "loaned" by lending entities like NMG, but rather, money is "created" as "counterfeit" money through (fraudulent) lending processes, as the term "counterfeit" is defined in Barron's Business Guides, Dictionary of Banking Terms, Fourth Ed. (2000), ISBN 0-7641-1260-0, at page 112, to wit:

> "COUNTERFEIT security, **currency**, or bank card made to appear genuine, **with the intention of <u>defrauding</u> an <u>unsuspecting</u> person**. Counterfeiting U.S.

> currency and bank cards is a felony under federal law, punishable by fines and prison terms. The U.S. Secret Service, a bureau of the Treasury Department, has responsibility for detecting and arresting counterfeiters." (All emphasis added.)

88. Without evidence of money "lent" to Plaintiffs by way of diminution in NMG's total value of its Net Worth, NMG Defendants' recourse to this action is untenable.

<u>BURDEN OF PROOF ALSO RESTS WITH DEFENDANTS</u>

89. Insofar as the burden of proof is concerned in this matter, which Plaintiffs can only carry so far through attached exhibits, burden also rests with WFS and NMG by way of their books and ledger accounts revealing Net Worths in order to prove Plaintiffs' claims as falsities, with this being so, Plaintiffs believe that this Court must adhere to the precedent set by the U.S. Supreme Court in the matter of <u>Campbell v. U.S.</u>, 365 US 95 (1961), in which the High Court asserted:

> "[t]he ordinary rule, based upon the considerations of fairness, does not place the burden upon a litigant of establishing facts peculiar within the knowledge of his adversary. United States v. New York, N.H. & H.R. Co., note 5." *Id.*, at p. 96.

(*See also*, the 6th Circuit's ruling in 763 F.2d 188 (1985) (relying on J. Wigmore, Evidence in Trials at Common Law, § 2486 at 290 (rev. 1981), when the Court said: "A guiding principle is to assign the burden to the "party who presumably has peculiar means of knowledge enabling him to prove its falsity if it is false."" And that burden of proof would be on the Defendants through books and ledger accounts of Net Worth diminution to prove Plaintiffs' claims are false.)

**WHEREFORE,** Plaintiffs request that this Court Order NMG and WFS to produce accounting books, records, and ledgers, since the mortgage agreement contracts of Exhibits "A" and "B," as offered, agreed upon, executed, and delivered to Plaintiffs by the Defendants, clearly specify that Plaintiffs were to receive "loans" of money as "borrowers," but said accounting records will reveal breach of contracts in the Net Worth columns. Furthermore, this Court should consider that absent production of accounting entries revealing Net Worth, Plaintiffs request that this Court declare any commitments by Plaintiffs commitments under the mortgage contracts of Exhibits "A" and "B" to be unenforceable and null and void; and also Order Defendants to return to Plaintiffs all "original notes" signed by Plaintiffs, or in the alternative, order the Defendants to pay the Plaintiffs the full-face value of each promissory note (2 notes) and each mortgage note (2 notes) amounting to two million, twelve thousand, eight hundred dollars ($2,012,800.00). If is further requested to Order the Defendants to pay Plaintiffs the amounts received by Defendants from the sale of said notes into the stream of commerce through undisclosed securitized loan sales.

## V. COUNT II

## PLAINTIFFS' JUSTIFIABLE RELIANCE IN SUPPORT OF BREACH OF CONTRACT CLAIMS AGAINST DEFENDANTS

90. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Money & Banking" – Sixth Edition, of Exhibit "1", in that NMG and WFS did not

utilize the deposits of bank customers to fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained that "no bank ever lends its deposits" -- no bank ever lends depositors' deposits.

91. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Money & Banking" – Second Edition (1959), of Exhibit "1-2", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained that when a customer's note is "monetized" by the bank the bank profits by accepting such notes and pays no interest on the notes due to the (undisclosed) "monetization" process.

92. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "A Primer on Money" (1964) by 84th Congress, 2d Session, of Exhibit "2", in that NMG and WFS did not fulfill their lending obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained that banks do <u>not</u> "lend" money, money is always being "created" through their alleged lending processes, by stating this:

> "Imagine there is only one bank in the county and this it has two private depositors, each with $50 in his checking account. Total bank demand deposits would then be $100. Suppose John Jones asked for a $50 loan from the bank, and the bank approved the loan. The bank would then lend the money to Mr. Jones by simply opening a checking account for him and depositing $50 in it. This is what ordinarily happens when anyone—business or private individual—borrows from a bank. The bank deposits the amount of the loan in the relevant checking account.
>
> In making the loan to Mr. Jones, the bank did not reduce anyone's previous bank balance. It simply credited the Jones account with $50. The total

> amount in bank demand deposits now becomes $150. They have, therefore, issued $50 "checkbook money."
>
> "The natural question to ask is, where does the bank get the additional $50 to issue and lend to Mr. Jones? The answer, as will become clear in the next chapter, is that the bank did not "get" the money at all. ***Money has been created.***" (Italics in original. Bold emphasis added.)

93. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Economics" – Sixth Edition (1975) of Exhibit "3", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained that the promissory notes are merely "swapped," and thus "monetized", in exchange for a demand deposit account credited with the monetized note that the customer may draw upon for funds, which is not a loan of money, but a direct exchange of value-for-value, unbeknownst to the alleged borrower:

> "Grisley Company went to the bank with something that is not money—his IOU—and walked out with something that is money—a demand deposit. When banks lend, they create demand deposits which are money. By extending credit the Wahoo bank has "monetized" an IOU. The Grisley Company and the Wahoo Bank have **created** and then **swapped** claims." (Emphasis added.);

in this transaction there was NOTHING of value given by the bank, but instead, the bank simply "swapped" the value of the IOU for the same value in the checking account it created for the Grisley Company, all behind the back of the Grisley Company and never disclosed to the Grisley that this was taking place behind the scenes—even though loan documents led the Grisley Company to believe that it was to receive an actual loan of real honest money that was the property of the bank as a lender.

94. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Economics" – Third Edition of Exhibit "3-3", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained how banks "create money" through what banks falsely claim is "the lending process," when it is not any such lending process at all, but rather, criminal deception and slight-of-hand bookkeeping on the part of the banks, unbeknownst to the alleged borrower.

95. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Economics" – Fifth Edition (1972) of Exhibit "3-5", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained that the promissory notes are merely "swapped," and thus "monetized," in exchange for a demand deposit account credited with the monetized note that the customer may draw upon for funds, which is not a loan of money, but a direct exchange of value-for-value, unbeknownst to the alleged borrower.

96. Support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Economics" – Eighteenth Edition (2009) of Exhibit "3-18", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained how making loans actually "creates" money through "checkable deposits" referred to as IOU's, i.e., promissory notes of the alleged borrower

deposited by the bank into a demand deposit checking account in the alleged borrower's name, which is not a loan of money, unbeknownst to the alleged borrower.

97. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Economics" – Sixth Edition (1993) of Exhibit "3"[15], in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained how making loans actually "creates" money through "checkable deposits" referred to as IOU's, i.e., promissory notes of the alleged borrower deposited by the bank into a demand deposit checking account in the alleged borrower's name, which is not a loan of money, unbeknownst to the alleged borrower.

98. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Money & Banking" – Fourth Edition (1998) (From a Declaration of Principles jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations) of Exhibit "4", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained how making loans actually "creates" money with this:

> "A bank that makes a loan monetizes a private debt by accepting as an asset the debt obligation of the borrower—that is the borrower's promise to repay. *[the "promissory note"]* The bank simultaneously creates a liability on its books in the form of a demand deposit balance in the amount of the loan." (Bracketed note is not in original.)

---

[15] Plaintiff has will produce the other McConnell Books which are basically the same but the reviewers of each book are completely different making the total list of reviewers close to 1,000 economist are verifying that the contents of these books from Exhibit 3 to Exhibit 3-18 all state the same conclusion or support the basic allegations in this Complaint, The majority of these books have not introduced as evidence but Plaintiff will produce all of the different 18 editions when necessary to prove that the community is very aware of the banking practices.

which is not a loan of money at all, but rather, it is deceit, trickery, criminal fraud, and deception on the part of the entity calling the "creating money" process a loan when it is no such thing.

99. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Money & Banking" – Fifth Edition (2003) ("From a Declaration of Principles jointly adopted by a Committee of The American Bar Association and a Committee of Publishers and Associations.") of Exhibit "4-1", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained how making loans actually "creates" money with this:

> "When a commercial bank makes a business loan, it accepts as an asset the borrower's debt obligation (the promise to repay), and creates a liability on its books in the form of a demand deposit balance in the amount of the loan. . . . The First Commercial Bank loan **created** a sum of money ($90,000) **that did not exist before** by generating a demand deposit balance for the merchant who received the loan. **This money creation** increased the bank's assets and liabilities by $90,000 each." (Bracketed note in original. Bold emphasis added.)

this "money creation" touted in Money & Banking – Fifth Edition, is <u>not</u> lending money at all, it is an undisclosed criminal act of theft of the promissory note(s) belonging to the signatories of the note(s) and using the value of the note(s) as the only valuable consideration to fund the demand deposit account (checking account) and telling the customer (the alleged "borrower," such as Plaintiffs) that it is a loan.

100. According to "Money & Banking" – Fifth Edition (2003) of Exhibit "4" (averred and quoted in the paragraph directly above) The American Bar Association is well

aware that the lending process is not a lending process at all, but rather, it is trickery, deceit, deception, willful and intentional fraud perpetrated on those like Plaintiffs who were seeking a real "loan" of money from a real "lender" as real "borrowers," are taken advantage so therefore the contract should be ruled procedural and substantively unconscionable by the intentional misrepresented of material facts with an intended purpose to cause great financial detriment or injury for the defendant's unjust enrichment in a intentional enterprise.

101. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Economics" – Seventh Edition (1971) of Exhibit "7", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because it is explained how making (alleged) loans involves having to "monetize" the promissory notes, which is referred to as "the debts of others," in order to create money via a demand deposit account - with this:

> "[T]he distinguishing feature of modern commercial banking is its ability, through making loans and investments, to **"monetize" the debts of others**, and thereby in effect **to create** demand deposits (checking accounts) which service as money." (Bold emphasis added. Parenthesis in original.);

but this is not lending money at all, it is "creating" money based upon the face value of the customer's signed note(s) that are "monetized" as deposits into checking accounts as the customer's own valuable consideration for what they only think is a real loan of money, when it is not (it is in reality a loan by the borrower based on the borrower's

promise to repay via the (promissory note(s) deposited) – then, while discussing bookkeeping entries on what is called the bank's "T-accounts," it continues with this:

> "On the assets side "Loans Outstanding" go up $1,000, and on the liabilities side "Demand Deposits" go up the same amount.";

however, there is no mention of what is happening to the Net Worth side of the "T-accounts" through the alleged lending process, since bookkeeping "T account" entries under Generally Accepted Accounting Principles (GAAP), are comprised of thee (3) columns – (1) the "Assets" column, (2) a "Liabilities" column, and (3) "Net Worth" column (in that order from left to right), but not one of Plaintiffs' justifiable reliance exhibits attached hereto ever mentions the Net Worth column of the "T-accounts," let alone a diminution of the bank or mortgage lender's "Net Worth" after an alleged loan transaction has been consummated on paper, which proves that Plaintiffs never received actual real loans of money from the Defendants as contractually promised.

102. In Plaintiffs' continuation of their reliance on "Economics" – Seventh Edition (1971) of Exhibit "5", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", as Exhibit "5" also states:

> "Remember that all ***[loan]*** payments are made by check, so you will simply take your loan as an addition to your checking deposit at the bank. Instead of giving you currency, the banker gives you a checking account. ***[Funded <u>only</u> by your deposited promise to pay, i.e., your promissory note.]*** The balance sheet still balances, as it always must. ***[It only deceptively balances in two columns, as the Net Worth column never changes, because it is never included in the transaction because it would expose the intentional misrepresentation and concealment of not lending the bank's money .]*** But now there is $1,000 more spendable money (checking deposits) in existence ***[due to the bank fraudulently "creating" money,***

***not actually "loaning" money]*** merely as a result of the bank's making a loan to you. . . . The bank has taken your promise to pay (which could not serve a money) ***[unless you are a banker that criminally turns that promise to pay into money for deposit through the "monetization" process that would land Plaintiffs in prison if they engaged in such crooked dealings]*** and has given you its promise to pay on the order of the check (which is widely acceptable money). ***[But the check the bank promises to pay on, was funded by YOUR <u>deposited promissory note</u> --- the bank has GIVEN NOTHING OF VALUE toward the alleged loan transaction.]*** It has "monetized" your debt. [fn 4 omitted] ***[This is a stark admission of the "monetization" process of your promissory note that you can then use as money by writing checks on the account set up by the bank. This is not disclosed to your on either the promissory note or mortgage note, which is nothing less than willful criminal intent to defraud by stealing YOUR notes for the bank's use as a loan right back to you.]*** The result is shown readily by a simplified bank balance sheet (sometimes called a T-account), listing only the changes that take place in this transaction. ***[That is right, as it ONLY lists the changes that took place with the promissory note which was SWAPPED as an EXCHANGE for a checking account created from the deposited note. The Net Worth column of that T-account is NEVER listed because it SHOULD be diminished by the amount of the loan if it were a "real loan," but it was <u>not</u> a real loan, it was slight-of-hand bookkeeping entries to only make you THINK you received a loan.]*** It shows that loans have increased $1,000 on the assets side and that deposits have increased $1,000 on the liabilities side of the balance sheet." ***[Again, there is "NO" MENTION of the Net Worth side being REDUCED by the $1,000 of the alleged loan, BECAUSE THERE WAS "NO" LOAN, there was ONLY a SWAP of value-for-value (the value of promissory note was swapped for the value of the checking account), but the value ORIGINATED from the customer's promissory note(s) (the alleged borrower), NOT from the bank or mortgage company that was offering to contractually loan their own real money.]*** (All bold italics added as Plaintiffs' testimonial reliance.)

103. EXHIBIT "7" – "ACCOUNTING" clearly depicts the General Accepted Accounting Procedures accounting procedure established by the Federal Reserve Board of Governors and is taught in every accounting class in the United States at every educational level from high school to doctorate level accounting at Harvard University. Exhibit "7" was written by Walter B. Meigs, CPA, Ph. D. Chairman of Accounting ,

University of Southern California, A.M. Mosich, Ph.D. CPA, professor from the University of Southern California and Professor Charles E. Johnson, CPA, Ph.D. University of Oregon, agree that the basic accounting Rule concerning the Balance sheet is Assets= Liabilities & Owner's Equity and or Net worth.[16]

104. Yale Professor and Ph.D. Ray C. Fair, Ph.D. and author of five books, and a member of the Crawles Foundation at Yale, a research Associate of the National Bureau of Economic Research and a Fellow of the Econometric Society. Dr. Fair received a B.A. in economics from Fresno State College in 1964 and a Ph.D. from M.I.t. in 1968. Dr. Fair taught at Princeton University from 1968 to 1974, when Dr. Fair joined the Economics Department at Yale University since 1974. Dr. Fair's book haw reviewed by 112 other Economist and Ph.D. listed on page 5 of 11 and 6 of 11 from the top colleges and

[16] Demand Deposit Accounts are another form of liabilities and are payable on demand as explained as payable on demand by the depositor. It is very questionable accounting practices for the banks to accept any negotiable instrument and use it as a bank deposit benefitting from an increase in the bank's assets and demand deposit account but yet claim that accepted promissory notes are not listed as depositor's deposit this at least implying two separate sets of books shown to the examiners. Meigs outlines very vividly the terms regarding "assets", "liabilities" and owner's equity" and or" net worth". Dr. Meigs explains the equation used to create the balance sheet according to the rules established by GAAP as Assets = liabilities = Owners equity or Net worth. Exhibit 26, written by Louis B. Thomas Jr. Ph.D. and Professor from Kansas State University wrote in his Book entitled, "Third Edition, MONEY, BANKING, AND ECONOMIC ACTIVITY also support Meig and the other Exhibits produced in this case and all the future Exhibits yet to be produced states on page 4 of 6 in Exhibit 26, in sub-heading "The Commercial Bank Balance Sheet as being "ASSETS =LIABILITES = NET WORTH" "Et worth, which is often call "capital accounts" in banking terminology is simply a residual term. It is calculated by subtracting the value of total liabilities from total assets. The capital as the value of a commercial bank may be viewed as the value of bank's owner's residual claims against the bank. "Another way of reviewing the balance sheet of a commercial bank is as a statement of the sources and uses of the bank funds. "Bank obtains funds by issuing debts in the form of "demand deposits." Dr. Thomas is supporting the other Exhibits and the actual claim of Defendant Nell by saying through the accounting procedure that the Bank monetized the Nells notes and increased their assets by the depositing their assets in the amount of the Nell Promissory note and increased liabilities by crediting Bank's liability by crediting bank's liability and/or demand deposit account for an equal amount. Dr. Thomas goes on to state on page 6 of 6 in Exhibit 26, "The local bank has created a liability in the form of a demand deposit by adding to its assets in the form of loans.

Universities in the United States. Dr. Fair and Dr. Karl Case writes on page 8 of 11 of Exhibit "27",

> "A BRIEF REVIEW OF ACCOUNTING" Central to accounting practices is the statement that "the books always balance." In practice, this means that it we take a snapshot of a firm-any firm including a bank- at a particular moment in time, its Assets =Liabilities =Net worth. "Assets are things that a firm owns that are worth something. For a bank, these assets include the bank building, its furniture, its holdings or government securities, cash in its vault, bonds stocks and so forth. Most important among a bank's assets or our purposes at least, are its loans. "When a bank makes a loan, the borrower gives the bank an IOU, a promise to repay a certain sum of money on or by a certain date. This promise is an asset of the bank because it is worth something." "A firm's Liabilities are simply its debts- what it owes. Stated another way, a bank's liabilities are the promises to pay, or IOU's', that it has issued. A bank's most important liabilities are its deposits. Deposits are debts owed to the depositors because when you deposit money in your account, you are in essence making a loan to the bank" The bank is not the real lender but is actually the borrower and the depositor is really the lender.

105. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Marketing for Bankers" – Fourth Edition (1993) by the American Bankers Association of Exhibit "8", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", whereby this exhibit is called upon to expose that the American Bar Association accepts and approves of the American Bankers Association's publications detailing the fraudulent lending practices and deceitful slight-of-hand bookkeeping entries made on the T-

accounts as alleged loans. (*See again* Exhibit "4-1" also noting the American Bar Association and American Bankers Association's publication.[17])

106. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Money and Banking: Analysis and Policy" of Exhibit "19-3", in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", since it is explained in Exhibit "19-3" that a bank's lending process actually is "THE PROCESS OF MONEY CREATION," with pertinent parts (all ***bold italics*** added as Plaintiffs' testimony in response to their justifiable reliance of this section) set forth from Exhibit "19-3" as follows:

> "Commercial banks, as has been noted, are both intermediaries and money creators. Banks also deposit money which they create in the process of lending. It is the power to lend newly created funds ***[this is "simply misrepresentation and a clear distortion of the truth*** . . . It enables the banks to acquire additional loans and investments in exchanged for deposits, which involves the banks in both intermediary and money creation activities."

however, "creating money" is not "loaning" money, and Exhibit "19-3" goes on to show examples of Assets and Liabilities columns of GAAP bookkeeping "T-accounts" but does not show any Net Worth reductions, then further explains the slight-of-hand

[17] Plaintiff is very concerned about ever having a fair and honest trial before any member of the American Bar Association when Exhibit 4, 4-1 and Exhibit 8 and every banking book written on behalf of the American Bankers Association or American Institute of Banking all have a startling Declaration of principles, "From a Declaration of Principles jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations." How can attorney not know about the real operation of the bankers? The chances of obtaining any legal representation in arguing a banking case is quite remote for fear of licensing restriction or the possible disbarment of representing a magnitude of this type of case. The attorneys are very aware of this threat to the ability to practice law. In Exhibit 19 as referenced in this case on page of 2 of 4 it states, "Full circle was reached to the latter 1960's with the Board of Governors, our supreme monetary authority, pleading for increased reliance of fiscal policy." A strong case can be made concerning this case by arguing that anything that poses a threat to the survival of the country or to the U.S. Constitution is against its "spirit" and should be rule unconstitutional as a "Question of Law," that I am currently working on.

lending process with this (again, all bold italics added by Plaintiffs as their justifiable reliance testimony):

> "The bank has exchanged its own non-interest bearing debt for an interest-bearing obligation of its customer. ***[The bank has cheated the customer by magically converting the non-interest bearing debt into interest-bearing debt.]*** This exchange of debts has its rationale in the bank's quest for income ***[as in the bank's hunger to get something for nothing through fraud and concealment of the truth underlying the transaction]*** and the customer's need for an acceptable means of payment. ***[the customer thinks he is paying on a real loan when there was no real loan]*** Simply by expanding its debts in the form of demand deposits ***[simply by stealing the value of the customer's note(s) and "swapping" the note(s) for value in a checking account, which is WHOLLY funded by the value of the customer's stolen note(s), is "creating money" through "counterfeiting"]*** the bank was able to increase its earning assets ***[through false pretenses]*** and at the same time supply the businessman with the ready funds he desired. ***[But the businessman desired a real "LOAN" of the bank's money property, which can ONLY be proven by a decrease of the bank's Net Worth column in the GAAP T-account, not a fake loan that the businessman himself funded through the value of the promissory note that was stolen by the bank and deposited (through undisclosed "monetization" (conversion)) into a checking account making the businessman ONLY THINK the funds in that checking account came from the bank when they actually came from the business man himself through the banks counterfeiting activities.]*** It will be noted that this transaction results in an increase of the money supply ***[increased money supply through monetization counterfeiting]*** since demand deposits have risen without any offsetting change elsewhere in the system. In other words, the bank has loaned money that it created ***[it misrepresented that the defendants were going to loaned money that was created upon the promissory note which Breached the agreement by simply by the*** "monetization of credit," ***"Credit" is nothing more than digital entries in computers and on spreadsheets.***

107. What the T-account bookkeeping entries under the Generally Accepted Accounting Practices (GAAP) "will" look like when banks / lenders, such as WFS and NMG, make a DISHONEST LOAN by "monetizing" notes for deposit, in which the end result is nothing more than "counterfeiting money" as described in the paragraph

directly above, is shown in Chart No. 1 below using $50.00 as the amount of the loan sought by the borrower, to wit:

## CHART NO. 1

### GAAP BOOKEEPING ENTRIES FOR "DISHONEST" LOAN OF $ 50

| | ASSETS IN CASH | | | LIABILITIES IN CHECKING DEMAND DEPOSITS | | | BANK'S / LENDER'S NET WORTH | |
|---|---|---|---|---|---|---|---|---|
| | Debits / | Credits | = | Debits / | Credits | + | Debits / | Credits |
| Step 1. | $ 100 | | | | $ 0 | | | $ 100 |
| Step 2. | $ 50 | | = | | $ 50 | + | | $ 100 |
| Step 3. | $ 150 | | = | | $ 50 | + | | $ 100 |

**Step 1 – Beginning balances.**

**Step 2 – Promissory note is "monetized" by lender by depositing into Assets, then "swapped" by lender for an equal value Demand Deposit Checking account for borrower's use. Thus, money Was "created" by lender using value of borrower's note(s), which is borrower's promise to pay. (This is "counterfeiting" of currency as money, plain and simple.)**

**Step 3 – Ending balances…Assets and Liabilities increase by $50 each of newly "created" (counterfeited) money -- no loan was given -- Net Worth is left <u>unchanged</u> -- "loan" documents do <u>not</u> support this transaction. The lender merely did an "even exchange" through undisclosed "counterfeiting" and called this transaction a loan when there was <u>no</u> <u>real</u> <u>loan</u>.**

108. There is nothing honest, moral, or lawful about the transaction shown in Chart No. 1 above, for it does not represent the black-letter terms of the lending contracts of Exhibits "A" and "B" that were offered, executed, and delivered to Plaintiffs by Defendants.

109. Plaintiffs contend that the books, ledgers, and account transactions of WFS and NMG, concerning the alleged loans that were granted to Plaintiffs under the contracts of Exhibits "A" and "B", will reveal the same even swap / even exchange entries as those of Chart No. 1 shown above.

110. The T-account bookkeeping entries under the Generally Accepted Accounting Practices (GAAP) should look like Chart No. 2 below when the banks / lenders, such as WFS and NMG, make an HONEST LOAN of $50.00 as the amount sought by the borrower, to wit:

## CHART NO. 2

### GAAP BOOKKEEPING ENTRIES FOR "HONEST" LOAN OF $ 50

| | ASSETS IN CASH | | = | LIABILITIES IN CHECKING DEMAND DEPOSITS | | + | BANK'S / LENDER'S NET WORTH | |
|---|---|---|---|---|---|---|---|---|
| | Debits | Credits | | Debits | Credits | | Debits | Credits |
| **Step 1.** | $ 100 | | | | $ 0 | | | $ 100 |
| **Step 2.** | | $ 50 | = | | $ 0 | + | - $ 50 | |
| **Step 3.** | $ 50 | | = | | $ 0 | + | | $ 50 |

**Step 1 – Beginning balances.**

**Step 2 – Subtract the $50 actually loaned from Net Worth.**

**Step 3 – Ending balances…Net Worth is reduced by the amount of the "honest" loan -- "loan" documents <u>do</u> support this transaction.**

111. Everything about the bookkeeping entries of Chart No. 2 is honest, moral, and lawful, when an honest loan of the lender's money property is granted to a borrower.

112. Plaintiffs did not receive an honest loan of the money that belonged to WFS or NMG as their money property, which can be fully proven by said Defendants' bookkeeping account ledgers.

113. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Money, Banking, And Economic Activity," Third Edition (1986) of Exhibit "26",

in that NMG and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because Exhibit "26" does not explain anything about actually "loaning" money as a true "lender," but rather, it explains the process of "money creation" through the alleged lending process, with pertinent parts (all ***bold italics*** added as Plaintiffs' testimony in response to their justifiable reliance of this section) set forth as:

> "The Commercial Bank Balance Sheet . . . A fundamental and simple accounting identity is the following: Assets – Liabilities = Net Worth or Assets = Liabilities + Net Worth . . . Banks obtain funds by issuing debts in the form of demand deposits . . . The T-account indicates the change in the bank balance sheet resulting from a given event. Suppose your Hometown Bank loans a shoe-store $10,000 for the purpose of adding inventory. The T-account of the Hometown Bank indicates the following balance-sheet changes:"

where the T-account shown in the exhibit reveals a **swap** and/or **even exchange** of "Loans +$10,000" and "Demand deposits + $10,000," but the T-account for New Worth is not shown at all, which then continues with: **"Whenever banks increase loans, the money supply increases by the identical magnitude."** (Bold added.), however, this is merely the "creating" money through counterfeiting, for such activity does indeed increase the money supply but the money created is not lawful money nor is it disclosed on any alleged loan documents -- it is NOT a real loan of the lender's property.

114. In support of Plaintiffs' breach of contract claims against Defendants, Plaintiffs rely on "Principles Of Economics" Second Edition (1992) of Exhibit "27", in that NMG

and WFS did not fulfill their "lending" obligations under the contracts they delivered in Exhibits "A" and "B", because Exhibit "27" explains, in pertinent part below, that:

> "Most important among a bank's assets, for our purposes at least, are its *loans*. When a bank makes a loan, the borrower gives the bank an *IOU*, a promise to repay a certain sum of money on or by a certain date. This promise is an asset of the bank because it is worth something. The bank could (and sometimes does) sell the IOU to another bank for cash. . . . A firm's l*iabilities* are simply its debts – what it owes. Stated another way, a bank's liabilities are the promises to pay, or IOUs, that it has issued. A bank's most important liabilities are its deposits. *Deposits* are debts owed to the depositors, . . . The basic account rule of accounting says that if we add up a firm's assets and subtract from this the total amount it owes to all those who have lent it funds, the difference it the firm's net worth. *Net worth* represents the value of the firm to its stockholders or owners.";

but with all of this, there is no mention of the Net Worth ever diminishing when a loan is made, and without discussion of a diminishing Net Worth through lending, the only way for the bank's alleged "lending process" can be entered into the T-accounts is to show an increase in its Assets account based upon the "monetized" IOU of the unsuspecting borrower, which is then "swapped" as an "even exchange" for a demand deposit checking account in the amount of the IOU, with this being so, THIS IS NOT A LOAN at all, it is "creating" money through "counterfeiting" money unbeknownst to the alleged borrower.

115. Plaintiffs' Exhibit "27" was acknowledged through review by 112 individuals from various affiliations listed therein, and the authors thereof, Karl E. Case was with Wellesley College, and Ray C. Fair was with Yale University, these reviewers confirmed that everything in the book is true and accurate as published.

**WHEREFORE**, Plaintiff asks this honorable Court to allow the opportunity for the Plaintiff to have the aid of discovery in order to ascertain the current violations and additional violations in order to file an amended Complaint and ask this Court for leniency in order for Plaintiffs to rectify any possible defects in this Complaint in the name of justice and the Plaintiff's right to have their Complaint heard.

COUNT THREE

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) CLAIMS

116. All named Defendants and Virtual Bank and Sabadell Bank (hereinafter referred to as Virtual) in this action have willingly, knowingly, and with malice and aforethought, engaged in the "racketeering activity" of **extortion**, as the term "racketeering activity" is defined at 18 U.S.C. § 1961(1)(A), since Plaintiffs made payments on what they thought at the time was a real honest "loan" of money, when no such loan of money or any valuable consideration was ever given by WFS or NMG, nor was any real honest loan of money ever intended to be given to Plaintiffs under the contracts of Exhibits "A" and "B", which clearly state otherwise within the four-corners of said exhibits.

117. The Defendants and Virtual Bank have never produced any books, records, and account ledgers of WFS and NMG will prove beyond all reasonable certainty that Plaintiffs were not granted a real honest "loan" of money, put another way, there was NO valuable consideration given to Plaintiffs in the form of a loan from the Defendants, which was a Breach of Contracts by Defendants.

118. The books, records, and account ledgers of WFS and NMG will prove beyond all reasonable certainty that Plaintiffs were intentionally mislead and/or deceived into making payments on what they only thought were real honest "loans" of money, because at times material to this action Defendants had NO plans to ever give ANY consideration under the contracts of Exhibits "A" and "B", which amounts to nothing less than a scheme to **"extort"** money from Plaintiffs to repay something they never received from the start.

119. All named Defendants and Virtual have intentionally and willingly, knowingly, and with malice and aforethought, engaged in the "racketeering activity" of **counterfeiting**, as the term "racketeering activity" is also defined at 18 U.S.C. § 1961(1)(B), since Plaintiffs only thought at the time they were getting a real honest "loan" of money, when Defendants only "created" money by swapping Plaintiffs notes of Exhibits "A" and "B" as "monetized" and deposited into WFS, NMG's and Virtual Assets account, which created the ONLY valuable consideration of an equal amount of

a demand deposit account (an even exchange), which is nothing less than "counterfeiting" money under 18 U.S.C. § 471, 472, 473.

120. All named Defendants WFS, Loftis, Sander, John Wieland and NMG (hereinafter referred to as Bank #1) and Virtual Bank and Sabadell Bank (hereinafter referred to as Bank #2) in this action have willingly, knowingly, and with malice and aforethought, engaged in the "racketeering activity" of **mail fraud**, as the term "racketeering activity" is also defined at 18 U.S.C. § 1961(1)(B), since all Defendants have caused the U.S. Mails to be used to send Plaintiffs monthly statements for extorted amounts to be paid on the counterfeited money that Plaintiffs thought at the time was a real loan of honest money, when no such real loan of honest money was ever granted to Plaintiffs.

121. Defendants Bank #1 and Bank #2 having engaged in racketeering **mail fraud** against Plaintiffs, is a federal crime under 18 U.S.C. § 1341 – Frauds and swindles, which reads in pertinent part as thus:

> "Whomever, having devised or intended to devise and scheme or artifice to defraud, or **for obtaining money or property by means of false or fraudulent pretenses**, representations, or promises, . . . or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such **counterfeit or spurious article,** for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, **or knowingly causes to be delivered by mail or such carrier according to the direction thereon**, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, **shall be fined under this title or**

> **imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."**

122. The Defendants, Bank #1 and Bank #2 have engaged in racketeering activities against Plaintiffs, as "racketeering activity" is defined at 18 U.S.C. § 1961(1)(B), as outlined in the paragraphs in this section above, also in inclusive of **robbery** of Plaintiffs' monthly money payments made on loans they never received from WFS or NMG, in which **robbery** is covered under 18 U.S.C. § 1951(a)(1), which reads in pertinent part:

> "The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, . . .";

but since Plaintiffs made willing payments on what they only thought was a real loan of "honest" money, the payments made on "counterfeited" money that was "created" through the crooked lending processes of WFS and NMG, Plaintiffs were robbed by all named Defendants of Plaintiffs' personal property money under RICO.

123. 18 U.S.C. §1962 (c) makes it illegal for "any person (Bank #1 and Bank #2) to have engineered an enterprise and with the association with Bank #1 and Bank #2 have acted in enterprising organizing scheme or engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

124. 18 U.S.C. 1962(d) in turn makes it "unlawful for any person (Bank #1 and Bank #2) have conspired to violate any provisions of subsection (a), (b) or (c) of this section."

125. Defendants Bank#1 and Bank #2 have violated 18 U.S.C. §1961(1), and as applicable to Action 1962, "racketeering activity means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1341 (Relating to mail fraud), and 18 U.S.C. §1344 (relating to financial institution fraud.)

126. Defendants Bank #1 and Bank #2 have violated 18U.S.C. §1961(3) for defines "person" as any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. 1961 (4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not legal entity."

127. Defendant Bank #1 and Bank #2 have violated18 U.S.C. § 1341, the mail fraud state invoked by 18 U.S.C. §1961 (1) as a predicate act. Makes it unlawful to have "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such or spurious article. For the purposes of executing such scheme or artifice or

attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the U.S. Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 30 years, or both."

128. 18 U.S.C. §1343, the wire fraud statute invoked by 18 U.S.C. 1961 (1) as a predicate act, "provides that "[w]hoever, having devised or intended to devise any scheme of artifice to defraud, or for obtaining money or causes to be transmitted by means of wire, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

129. At all relevant times, Defendants, Bank #1 and Bank #2 including the employees who conducted Defendant's affairs through illegal acts (including by communicating false interest rate quotes to Plaintiff or directing other employees to do so) were "person[s]" within the meaning of 18 U.S.C. §1961(4), with a with definable corporate structure and a hierarchy of corporate direction and control.

130. At all relevant times, the Plaintiff was a "person" within the meaning of 18 U.S.C.

§1961 (3).

131. DEFENDANT'S Bank #1 and Bank #2 have formed an collective association, corporation, in a prearranged formation and skillfully and knowingly participated in the process of misrepresenting material facts to the Plaintiff and actually concealed other material facts from the Plaintiff in a conspiratorial scheme by communication by misrepresenting material facts and knowingly and willfully and carried out their assignments as participants and/or members of their association, corporation and acted together in a consensual enterprise by falsely stating that the Plaintiff's loan was approved and the interest rate will be 1 % of the unpaid balance when the actual interest rate was immeasurable.

132. Plaintiffs have filed this Complaint against Bank #1 and Bank #2 by using false and/or phony documents statements used to support the falsified loan demands for payment of unlawful debts in violation of 18 U.S.C. §1961(c) and collected funds from Plaintiff based upon RICO violations.

133. The conduct and each and every named Defendant named and yet not named including and not limited to Bank #1 and Bank 2 are involved in this scheme and the violations against Plaintiffs is hardly an isolated occurrence that as resulted in the filing of this Complaint.

134. In perpetrating this illegal scheme each Defendant Bank #1 and Bank #2 have

directly or indirectly through its corporate structure has designed and implemented a uniform scheme and false paperwork to manipulate Plaintiffs at his financial detriment.

135. The Defendants Bank #1 and Bank #2 daily actions of misrepresenting and concealing the real truth from Plaintiff is a common, uniform system of conspiratorial procedures used every day against Plaintiffs for their unjust enrichment.

136. For at least the past six years, Defendants, Bank #1 and Bank #2 have knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. §1962(c) by committing the predicate acts of mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. §1343 which benefitted the collective Defendants by their collection of unlawful profits.

137. The Defendants Bank #1 and Bank #2 have committed the predicate act of mail fraud under 18 U.S.C. §1341, THUS TRIGGERING Section §1962(c) liability, by devising or intending to "devise a scheme or artifice to defraud the Plaintiff of his promissory and security instrument(s) by monetizing, securitizing insurance fraud, selling falsified negotiable instruments and "for the purpose of executing such scheme or artifice or attempting to do so," placed or knowingly caused to be placed in a post office or authorized depository for mail matter, documents or packages to be sent or delivered by the Postal Service or a private or commercial interstate carrier, or received from the Defendants the documents or packages, including: (i)documents offering for sale notes

and other securities (ii)the corresponding regarding offerings on notes and other securities (the conduct described in this paragraph to as mail fraud").

138. On information and belief, the Mail Fraud is the results of Defendants (Bank #1 and Bank #2) "having devised or intended to devise a scheme or artifice to defraud" the Plaintiff of the value of Plaintiff's Notes by unilaterally funding the alleged loan with the value of the Plaintiff's negotiable notes which was never part of either the Promissory Note and/or Deed of Trust Note through "false or fraudulent pretenses, with the intent to harm, and made representations that were false, on or about April 21, 2006."

139. The HUD settlement form on line 202 (clearly marked as Plaintiffs Exhibit "C") makes it very clear that the alleged loan was to be new money and not funded in anyway by the Plaintiff himself.

140. Defendants Bank #1 and Bank #2 have devised the scheme or artifice to monetize Plaintiff's Notes as describe herein, and used money created based upon the demand deposit account of Plaintiff and then sold the notes through securitization without the approval, consent and/or knowledge of Plaintiff thus violating both Contract with Plaintiff, the Promissory Note and the Deed of Trust Note.

141. Through the racketeering scheme described above, Defendants Bank #1 and Bank #2 have used the enterprise to improperly increase their profits to the detriment of holders of

notes and other securities, who resided in different states.

142. Plaintiffs' allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' Bank #1 and Bank #2 have used the Internet or the mails across state lines as well as agreements between entities in different states to create their scheme to intentionally, willfully, with malice to harm Plaintiffs. Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiffs across state lines satisfies RICO's requirement of an effect on interstate commerce.

143. Part from constructing and carrying out the racketeering scheme detailed above, Defendants Bank #1 and Bank #2 have conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

144. Defendants Bank #1 and Bank #2 have organized and implemented the scheme, and ensured it continued uninterrupted by concealing their concealment of material facts in a conspiratorial enterprise to increase their unjust enrichment.

145. Defendants knew the scheme would defraud Plaintiffs of the value of his notes and through securitization, and monetization the Defendants, Bank #1 and Bank #2 have used Plaintiff's negotiable instruments thus making many hundreds of thousands of dollars.

146. At all times relevant to this case the Defendants Bank #1 and Bank #2 have remained full participants despite the fraudulent nature of the enterprise. At any point

while the scheme has been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence. Rather than stopping the scheme, however, the members of the enterprise deliberately chose to continue it, to the direct detriment of the Plaintiff and the unjust enrichment of the defendants.

147. At all times relevant to this case Defendant Bank #1 and Bank #2 have committed securities fraud by not retiring the original notes from WFS which were paid and/or should have been paid by NMG.

148. This loan (NMG) allegedly made was to pay off WFS Loan # 115683340 (Wieland Financial Services, Inc). Recorded in Beaufort County, SC Register of Deeds office, Book 02282 pages 0359-0382 file numbers 2005104121 on 12/07/2005 and MERS Min #1000776-0000007119-4. Loan # 115683340 was apparently never paid off because Loan # 115683340 still active in the register of deeds office and MERS Min #1000776-0000007119-4 is active in MERS. See Plaintiff's Exhibit "29".

149. The fraudulent trading of supposedly paid off notes on Wall Street is a conspiratorial crime of the fruits thus risking Nell under double jeopardy.

150. Plaintiff should be in receipt of all the money that has been proffered by Bank #1 and Bank #2 Breach of Contract. This constitutes, among other crimes a breach of

contract and securities fraud. (These fraudulent notes are still being traded on Wall Street) Mr. and Mrs. Nell fully intend to inform the Securities & Exchange Commission.

151. At all times pertinent Bank #1 and Bank #2 have violated securities fraud violations for trading these fraudulent notes are still be trading by investors on Wall Street when these notes should have been retired and their monetary value of $1,000,000 should have been returned to Plaintiffs.

**Plaintiffs Suffered Injury Resulting From The Pattern of Racketeering Activity.**

152. Defendants Bank #1 and Bank #2 intentionally, deliberately, with malice, lasciviously and intentionally fraudulently collected interest and principle payments from Plaintiffs on a loan that the Defendants knew, should have known and deliberately concealed their true intentions of concealing a material facts that defendants was not going to honor their own contract and actually decrease the Banks' Assets and decrease the Bank's Net worth account as their contract clearly defines as the core basis of the agreement and/or Mortgage.

153. Plaintiffs are direct victims of Defendants' Bank #1 and Bank #2's wrongful and unlawful conduct. Plaintiffs' injuries were direct, proximate, foreseeable and natural consequences of Defendants' conspiracy; indeed, those effects were precisely why the scheme was concocted. In making payments to Defendants, Plaintiffs gave money in the custody or control of financial institutions. There are no independent factors that account for Plaintiffs' economic injuries, and the loss of money satisfies RICO's injury requirement.

154. The pattern of racketeering activity, as described in this Complaint, is continuous, ongoing and will continue unless Defendants Bank #1 and Bank #2 are enjoined from continuing their racketeering practices. Defendants have consistently demonstrated their unwillingness to discontinue the illegal practices described herein, and they continue their pattern of racketeering as of the filing of this Complaint.

155. Plaintiffs are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

**WHEREFORE,** Plaintiff ask this honorable Court to allow the opportunity for the Plaintiff to have the aid of discovery in order to ascertain the current violations and additional violations in order to file an amended Complaint and ask this Court for leniency in order for Plaintiffs to rectify any possible defects in this Complaint in the name of justice and the Plaintiff's right to have their Complaint heard.

John A. Nell ____________ Rebecca L. Nell ____________