# ECONOMICS



State of Pennsylvania

County of Cumberland } SS:

I, Parvin M. Mehrtash, a Notary Public of the State of Pennsylvania hereby certifies that the attached copies are a true, correct, complete and unaltered original copies made personally by me of the following pages Front Cover, iii, iiii, xxiv, xxv, 315, 316, and 317 copied directly from "Economics" Sixth Edition, written by Campbell R. McConnell Ph.D., Professor of Economics, University of Nebraska-Lincoln: ISBN 0-07-044905-8

In Witness Whereof, I have hereunto set my hand and official seal

Common Wealth of PA
NOTARIAL SEAL
Parvin M. Mehrtash, Notary Public
Upper Allen Twp., Cumberland County
My Commission Expires March 07, 2016

Parvin M. Mehrtash

Parvin M. Mehrtash, Notary Public

# ECONOMICS

PRINCIPLES, PROBLEMS, AND POLICIES

SIXTH EDITION



CAMPBELL R. McCONNELL
PROFESSOR OF ECONOMICS
UNIVERSITY OF NEBRASKA-LINCOLN

McGRAW-HILL BOOK COMPANY

NEW YORK ST. LOUIS SAN FRANCISCO AUCKLAND
DÜSSELDORF JOHANNESBURG KUALA LUMPUR LONDON
MEXICO MONTREAL NEW DELHI PANAMA PARIS
SÃO PAULO SINGAPORE SYDNEY TOKYO TORONTO

TO MEM

This book was set in Helvetica by York Graphic Services, Inc.
The editors were Michael Elia and Edwin Hanson;
the designer was J. E. O'Connor;
the production supervisor was Joe Campanella.
New drawings were done by Eric G. Hieber Associates Inc.
R. R. Donnelley & Sons Company was printer and binder.

# ECONOMICS

Copyright © 1963, 1966, 1969, 1972, 1975 by McGraw-Hill, Inc. All rights reserved. Formerly published under the title of ELEMENTARY ECONOMICS: PRINCIPLES, PROBLEMS, AND POLICIES, copyright © 1960 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher.

2 3 4 5 6 7 8 9 0 DODO 7 9 8 7 6 5

Library of Congress Cataloging in Publication Data

McConnell, Campbell R

Economics: principles, problems, and policies.

First ed. published in 1960 under title: Elementary economics: principles, problems, and policies.

1. Economics. I. Title.

HB171.5.M139 1975 330 74-18475

ISBN 0-07-044905-8

for the first quarter, 14 through 33 for the second, and 34 through 45 for the third. Finally, those interested in the one-semester course will be able to discern several possible groups of chapters that will be appropriate to such a course. Tentative outlines for three one-semester courses, emphasizing macroeconomics, microeconomics, or a survey of micro and macro theory, follow this preface on page xxvii.

## SUPPLEMENTS

The sixth edition of *Economics* is accompanied by a wide range of useful supplements, making it perhaps the most complete instructional package available for the principles course.

A new fifth edition of *Economic Issues: A Book of Readings* has been prepared; it embodies some distinctive features which make it a valuable supplement for this or any other standard principles of economics textbook.

Professor Robert C. Bingham of Kent State University has prepared three valuable supplements. First, students have found his *Study Guide* to be an indispensable aid. Second, his *Economic Concepts* provides carefully designed programmed materials for all the key analytical areas of the principles course. Finally, his supplement *Economics, Mathematically Speaking* translates the verbal-tabular-graphical development of theory found in *Economics* into the language of mathematics. Specifically oriented to the principles course, instructors who prefer a more quantitative approach will find this supplement to be most helpful.

A *Personalized System of Instruction* will be available for the first time with the sixth edition. These materials have been prepared by Professor Jerry Petr of the University of Nebraska and contain instructional objectives and mastery tests designed to accompany the sixth edition. This system of self-paced instruction offers instructors and their students an exciting new pedagogical option.

My *Instructor's Manual* includes some comments of a pedagogical character and, more important, is a reservoir of objective and essay questions. The sixth edition of the *Manual* has been substantially expanded with the addition of some 275 new multiple-choice questions.

The *Test File* of questions which was introduced with the fourth edition is also available in enlarged form. The file contains the multiple-choice questions from the *Instructor's Manual* which can be arranged in any desired sequence and efficiently employed in constructing an examination. The *Test File* was received most enthusiastically by adopters of the fourth edition, but somewhat less ecstatically by the publisher, who provides the *File* without charge to users of *Economics*. I am particularly pleased that other authors have accorded the *Test File* the most sincere form of flattery.

Color transparencies and black-and-white enlarged transparency masters for overhead projectors accompany the text.

## DEBTS

It has been more than a decade since the first edition of *Economics* was published. Its acceptance, which was most generous from the start, has expanded with each edition. An important by-product of this widespread acceptance is that many teachers and students have been kind enough to give me the benefit of their criticisms and suggestions.

The sixth edition has had the benefit of comprehensive reviews by the following scholars: Daniel Aspis of Pratt Institute, Frank J. Bonell and Frank J. Jones of Notre Dame, Douglas M. Brown of Georgetown, Robert V. Horton of Purdue, Leon P. Jorgensen, Gaines H. Liner, Gerald W. Stone, Jr., and Rainer Stuper, all of the University of North Carolina at Charlotte, James C. Loughlin of Central Connecticut State College, Eliot S. Orton of New Mexico State, Rodney D. Peterson of Colorado State, Jerry Petr of Nebraska, and Percy O. Vera of Sinclair Community College. Extremely helpful reviews of the new chapter on radical economics were contributed by Ali S. Fatemi of the University of Akron, Charles Perrow of Stony Brook, Richard Roehl of Berkeley, Stephen C.

Stamos, Jr. of Bucknell, William K. Tabb of Queens College, and James H. Weaver of The American University. R. D. Peterson of Colorado State University, Richard Roehl of Berkeley, W. D. Wubben of the University of North Carolina at Charlotte, Paul D. Zook of University of Texas at El Paso, and Reuben A. Zubrow of Colorado reviewed the new chapter on the Phillips Curve and incomes policies.

My colleagues at the University of Nebraska have been most generous in giving me their assistance and encouragement. Last, but not least, my daughter Lauren undertook the onerous task of preparing the index.

It is obvious that in a very real sense "my" book has become a collective endeavor. But, as tradition demands, I accept sole responsibility for all errors of omission and commission.

CAMPBELL R. McCONNELL

**Transaction 6: Granting a loan** You will recall that in addition to accepting deposits, commercial banks have a basic function of granting loans to borrowers. What effect does commercial bank lending have upon the balance sheet of a commercial bank?

Suppose that the Grisley Meat Packing Company of Wahoo decides that the time is ripe to expand its facilities. Suppose, too, that the company needs exactly $50,000—which, by some unexplained coincidence, just happens to be equal to the Wahoo bank's excess reserves—to finance this project.

The company approaches the Wahoo bank and requests a loan for this amount. The Wahoo bank is acquainted with the Grisley company's fine reputation and financial soundness and is convinced of its ability to repay the loan. So the loan is granted. The president of the Grisley company hands a promissory note—a high-class IOU—to the Wahoo bank. The Grisley company, like all other modern firms, is interested in paying its obligations by check. Hence, instead of receiving a bushel basket full of cash from the bank, the Grisley company will get a $50,000 increase in its demand deposit in the Wahoo bank. From the Wahoo bank's standpoint it has acquired an interest-earning asset (the promissory note) and has created demand deposits to pay for this asset.

In short, the Grisley company has swapped an IOU for the right to draw an additional $50,000 worth of checks against its demand deposit in the Wahoo bank. Both parties are pleased with themselves. The Wahoo bank now possesses a new asset—an interest-bearing promissory note which it happily files under the general heading of "Loans." The Grisley company, sporting a fattened demand deposit, is now in a position to expand its operations.

*At the moment the loan is negotiated,* the Wahoo bank's position is shown by balance sheet 6a.

All this looks innocent enough. But a closer examination of the Wahoo bank's balance statement will reveal a startling fact: *When a bank makes loans, it creates money.* The president of the Grisley company went to the bank with something which is not money—his IOU—and walked out with something that is money—a demand deposit.[5] When banks lend, they create demand deposits which are money. By extending credit the Wahoo bank has "monetized" an IOU. The Grisley company and the Wahoo bank have created and then swapped claims. The claim created by the Grisley company and given to the bank is not money; an individual's IOU is not generally acceptable as a medium of exchange. But the claim created by the bank and given to the Grisley company is money; checks drawn against a demand deposit are acceptable as a medium of exchange. It is through the extension of credit by commercial banks that the bulk of the money used in our economy is created.

BALANCE SHEET 6a: WAHOO BANK (*when loan is negotiated*)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Reserves | $ 60,000 | Demand deposits* | $100,000 |
| Loans* | 50,000 | Capital stock | 250,000 |
| Property | 240,000 | | |

But there are important forces which circumscribe the ability of a commercial bank to create demand deposits—that is, "bank money"—by lending. In the present case, the Wahoo bank can expect the newly created demand deposit of $50,000 to be a very active account. The Grisley company would not borrow $50,000 at, say, 8 or 10 percent for the sheer joy of knowing the funds were available if needed. Let us assume that the Grisley company awards a $50,000 contract to the Quickbuck Construction Company of Omaha. Quickbuck, true to its name, completes the expansion job and is rewarded with a check for $50,000 drawn by the Grisley company against its demand deposit in the Wahoo bank. The Quick-

[5] In transaction 3, demand deposits were created, but only by currency going out of circulation. Hence, there was a change in the composition of the money supply but no change in the total supply of money.



Exhibit 3
Page 6 of 8

buck company, having its headquarters in Omaha, does not deposit this check back in the Wahoo bank but instead deposits it in the Fourth National Bank of Omaha. The Fourth National Bank now has a $50,000 claim against the Wahoo bank. This check is collected in the manner described in transaction 5. As a result, the Wahoo bank *loses* both reserves and deposits equal to the amount of the check; the Fourth National Bank *acquires* $50,000 of reserves and deposits. In short, assuming a check is drawn by the borrower for the entire amount of the loan ($50,000) and given to a firm which deposits it in another bank, the Wahoo bank's balance sheet will read as follows *after the check has been cleared against it:*

BALANCE SHEET 6b: WAHOO BANK (*after a check drawn on the loan has been collected*)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Reserves* | $ 10,000 | Demand deposits* | $ 50,000 |
| Loans | 50,000 | Capital stock | 250,000 |
| Property | 240,000 | | |

You will note immediately that after the check has been collected, the Wahoo bank is just barely meeting the legal reserve ratio of 20 percent. The bank has *no excess reserves.* This poses an interesting question: Could the Wahoo bank have lent an amount greater than $50,000—an amount greater than its excess reserves—and still have met the 20 percent reserve requirement if a check for the full amount of the loan were cleared against it? The answer is "No." For example, suppose the Wahoo bank had loaned $55,000 to the Grisley company. Collection of the check against the Wahoo bank would have lowered its reserves to $5,000 (equal to $60,000 minus $55,000) and deposits would again stand at $50,000 (equal to $105,000 minus $55,000). The ratio of actual reserves to deposits would now be only $5,000/$50,000, or 10 percent. The Wahoo bank could thus not have lent $55,000. By experimenting with other figures in excess of $50,000, the reader will find that the maximum amount which the Wahoo bank could lend at the outset of transaction 6 is $50,000. This figure is identical with the amount of excess reserves which the bank had available at the time the loan was negotiated. We can conclude that *a single commercial bank in a multibank banking system can lend only an amount equal to its initial pre-loan excess reserves.* Why? Because when it lends, it faces the likelihood that checks for the entire amount of the loan will be drawn and cleared against the lending bank. A lending bank can anticipate the loss of reserves to other banks equal to the amount it lends.

There is a qualification to this discussion: When a bank makes a loan, some of the checks drawn by the borrower *may* be redeposited back in the lending bank. To the extent that this happens, the bank is able to lend an amount greater than its excess reserves. You might try this problem: Suppose a bank with $1,000 in excess reserves knows from past experience that for every loan it negotiates, checks drawn on that loan equal to one-tenth of the value of the loan will be redeposited in the bank. Thus, if the bank makes a $100 loan, the borrower promptly draws ten checks for $10 each. Nine of these wind up in other banks. The tenth is redeposited by its recipient in the lending bank. When the bank knows this in advance, what is the maximum amount it can lend on the basis of $1,000 of excess reserves?

Now that you are convinced that this credit-creating business can be complicated, let us accept our original conclusion that commercial banks can lend dollar for dollar with their excess reserves as being accurate enough for our purposes. It is a pretty good approximate statement of a single commercial bank's credit-creating potential.

If commercial banks create demand deposits—that is, money—when they make loans, it seems logical to inquire whether money is destroyed when the loans are repaid. The answer is "Yes." Using balance sheet 6b, let us see what happens when the Grisley company repays the $50,000 it borrowed.

To simplify, we shall (1) suppose that the loan



Exhibit 3
Page 7 of 8

is repaid not in installments but rather in one lump sum three years after the date of negotiation, and (2) ignore interest charges on the loan. Repayment may take two forms. Most likely, the Grisley company will write a check for $50,000 against its demand deposit, which presumably has been fattened by extra profits resulting from the company's expanded operations. As a result, the Wahoo bank's demand-deposit liabilities decline by $50,000; the Grisley company has given up $50,000 worth of its claim against the bank's assets. In turn, the bank will surrender the Grisley company's IOU which it has been patiently holding these many months. The bank and the company have reswapped claims. But the claim given up by the Grisley company is money; the claim it is repurchasing—its IOU—is not. The supply of money has therefore been reduced by $50,000; that amount of demand deposits has been destroyed, unaccompanied by any increase in the money supply elsewhere in the economy. The Grisley company's IOU has been "demonetized." On the Wahoo bank's balance sheet, demand deposits and loans both fall by $50,000. You will note that the decline in demand deposits increases the bank's holdings of excess reserves; this provides the basis for new loans to be made.

The second repayment alternative open to the Grisley company is to repay by cash. It would be very unlikely that the company would want to bear the risk of accumulating such a large sum of money in its safe. But even if it did, the supply of money would still decline by $50,000 when cash repayment was made. In this case, the Grisley company would repurchase its IOU by handing over $50,000 in cash to the bank. This causes loans to fall on the bank's balance sheet by $50,000 and, obviously, cash to increase by $50,000. Remember that we specifically excluded currency held by banks from the money supply on the ground that to include such cash would be double counting; it is apparent that this constitutes a $50,000 reduction in the supply of money.

What will the Wahoo bank do with the additional cash it now holds? In all probability, it will add this $50,000 to its reserves on deposit with the Federal Reserve Bank. However, because vault cash is counted as reserves, the Wahoo bank's reserves would obviously increase even if it held the $50,000 as cash.

**Transaction 7: Buying government securities** When a commercial bank buys government bonds[6] from individuals and business concerns, the effect is substantially the same as that of lending. New money is created. To illustrate, let us assume that the Wahoo bank's balance sheet initially stands as it did at the end of transaction 5. Now let us suppose that, instead of borrowing all the needed $50,000 from the Wahoo bank, the Grisley company borrows just $25,000 and obtains an additional $25,000 by selling government bonds which it holds to the bank. The Wahoo bank pays for the Grisley company's IOU and the IOUs (bonds) of the government in the same way, by increasing the Grisley company's demand deposit. Demand-deposit liabilities increase by $50,000, and the bank's assets of securities and loans increase by $25,000 each. Immediately after negotiating the loan and the bond purchase, the Wahoo bank's balance sheet will appear as follows:

BALANCE SHEET 7a: WAHOO BANK (*when loan is negotiated and bonds purchased*)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Reserves | $ 60,000 | Demand deposits* | $100,000 |
| Securities* | 25,000 | Capital stock | 250,000 |
| Loans* | 25,000 | | |
| Property | 240,000 | | |

The important point is that demand deposits, that is, the supply of money, have been increased by a total of $50,000, as in transaction 6. *Commercial bank bond purchases from the public increase the supply of money in the same way as does lending to the public.* The bank accepts government

[6] Commercial banks are restrained by law in their purchase of private securities. It is felt that banks should be restricted to the performance of recognized banking functions and not permitted to become holding companies or speculative institutions.