Exhibit 3-3
Page 1 of 6

State of Pennsylvania

County of Cumberland } SS:

I, Parvin M. Mehrtash, a Notary Public of the State of Pennsylvania hereby certifies that the attached copies are a true, correct, complete and unaltered original copies made personally by me of the following pages Front Cover, iii, xi, 307, 308, 309 and 310 copied directly from "Economics" Third Edition, written by Campbell R. McConnell Ph.D., Professor of Economics, University of Nebraska-Lincoln: Library of Congress Catalog Number 65-25548.

In Witness Whereof, I have hereunto set my hand and official seal this

03-06-2013

Common Wealth of PA
NOTARIAL SEAL
Parvin M. Mehrtash, Notary Public
Upper Allen Twp., Cumberland County
My Commission Expires March 07, 2016

Parvin M. Mehrtash

Parvin M. Mehrtash, Notary Public

# ECONOMICS

## Principles, Problems, and Policies

### Third Edition

CAMPBELL R. McCONNELL

Professor of Economics

University of Nebraska

McGRAW-HILL BOOK COMPANY

New York, St. Louis

San Francisco, Toronto

London, Sydney

iii

be appropriate to such a course. A tentative outline for a one-semester course introducing both macro- and microeconomics is provided.

This endeavor has benefited greatly from the advice and counsel of many teachers and students. Let me first restate my debt to the reviewers of the original manuscript: L. S. Van Scoyoc of Bowling Green State University, John Auten of Rice Institute, J. J. Kaufman of Pennsylvania State University, Raymond W. Ritland of Auburn University, and Howell E. Jones of Bethany College. I owe a special debt to Prof. Arthur M. Okun of Yale University who contributed much to both the content and organization of this text. Also, I have unashamedly exploited the brainpower of a number of present and former University of Nebraska colleagues: Robert C. Bingham, Wallace C. Peterson, Clemens B. Thoman, and Harry M. Trebing. Many users of the first edition were kind enough to offer me their counsel and criticism: in particular I must mention Professors Clayton Hall and Fred Picard of Ohio University, David G. Brown of the University of North Carolina, and Carl Stern of Randolph-Macon. This third edition has benefited from comprehensive reviews provided by Kenneth O. Alexander of Michigan Technical University, James M. Cahill of Manhattan College, Ira Castles of Delta State College, Edward Coen of the University of Minnesota, Kalman Goldberg of Bradley University, Keith D. Evans of San Fernando Valley State College, Will Lyons of Franklin and Marshall College, Ray Marshall of the University of Texas, Glenn L. Simpson of Colorado State University, Janet L. Weston of the University of Illinois, and Simon N. Whitney of Rutgers University. Welcome and very helpful comments of a more specific character were received from Florence Jaffy of the College of San Mateo, Jan Kmenta of the University of Wisconsin, L. Emil Kreider of Southern Illinois University, and Eugene A. Mattis of West Virginia University. As tradition demands, I accept sole responsibility for all errors of omission and commission.

*Campbell R. McConnell*

1. When a bank accepts deposits of cash, the composition of the money supply is changed, but the total supply of money is not altered.

2. Commercial banks which are members of the Federal Reserve System are required to keep legal reserve deposits, or simply "reserves," equal to a specified percentage of their own deposit liabilities on deposit with the Federal Reserve Bank of their district. The reserve ratio indicates the size of this "specified percentage." Reserves are a means by which the monetary authorities can control the lending policies of commercial banks.

3. The amount by which a bank's actual reserves exceed its required reserves is called "excess reserves."

4. Commercial bank reserves are an asset to the commercial bank but a liability to the Federal Reserve Bank holding them.

5. A bank which has a check drawn and collected against it will lose both reserves and deposits equal to the value of the check to the bank receiving the check.

## Money-creating Transactions of a Commercial Bank

The next two transactions are particularly crucial because they explain how a single commercial bank can literally create money by making loans to individuals and businesses and by purchasing government bonds. Though these transactions are similar in many respects, we treat them separately.

**Transaction 6: granting a loan.** You will recall that in addition to accepting deposits a basic function of commercial banks is the granting of loans to borrowers. What effect does commercial bank lending have upon the balance sheet of a commercial bank?

Suppose that the Grisley Meat Packing Company of Wahoo decides that the time is ripe to expand its facilities. Suppose, too, that the company needs exactly $50,000—which, by some unexplained coincidence, just happens to be equal to the Wahoo bank's excess reserves—to finance this project.

The company approaches the Wahoo bank and requests a loan for this amount. The Wahoo bank is acquainted with the Grisley company's fine reputation and financial soundness and is convinced of its ability to repay the loan. So the loan is granted. The president of the Grisley company hands a promissory note—a high-class IOU—to the Wahoo bank. The Grisley company, as all other modern firms, is interested in paying its obligations by check. Hence, instead of receiving a bushel basket full of cash from the bank, the Grisley company will simply get a $50,000 increase in its demand deposit in the Wahoo bank.

In short, the Grisley company has swapped an IOU for the right to draw an additional $50,000 worth of checks against its demand deposit in the Wahoo bank. Both parties are pleased with themselves. The Wahoo bank now possesses a new asset—an interest-bearing promissory note which it happily files under the general heading of "Loans." The Grisley company, sporting a fattened demand deposit, is now in a position to expand its operations.

*At the moment the loan is negotiated,* the balance sheet of the Wahoo bank looks like this:

**BALANCE SHEET 6a: WAHOO BANK** (when loan is negotiated)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Property | $240,000 | Capital stock | $250,000 |
| Reserves | 60,000 | Demand deposits* | 100,000 |
| Loans* | 50,000 | | |

All this looks innocent enough. But a closer examination of the Wahoo bank's balance statement will reveal a startling fact: *When a bank makes loans, it creates money.* The president of the Grisley company went to the bank with something which is not money—his IOU—and walked out with something that is money—a demand deposit.[7] When banks lend, they create demand deposits which are money. By extending credit the Wahoo bank has "monetized" an IOU. The Grisley company and the Wahoo bank have created and then swapped claims. The claim created by the Grisley company and given to the bank is not money; an individual's IOU is not generally acceptable as a medium of exchange. But the claim created by the bank and given to the Grisley company is money; checks drawn against a demand deposit are acceptable as a medium of exchange. It is through the extension of credit by commercial banks that the bulk of the money used in our economy is created.

But there are important forces which circumscribe the ability of a commercial bank to create demand deposits—that is, "bank money"—by lending. In the present case, the Wahoo bank can expect the newly created demand deposit of $50,000 to be a very active account. The Grisley company would not borrow $50,000 at, say, 8 per cent for the sheer joy of knowing the funds were available if needed. Let us assume that the Grisley company awards a $50,000 contract to the Quickbuck Construction Company of Omaha. Quickbuck, true to its name, completes the expansion job and is rewarded with a check for $50,000 drawn by the Grisley company against its demand deposit in the Wahoo bank. The Quickbuck company, having its headquarters in Omaha, does not deposit this check back in the Wahoo bank but instead deposits it in the Fourth National Bank of Omaha. The Fourth National Bank now has a $50,000 claim against the Wahoo bank. This check is collected in the manner described in transaction 5. As a result, the Wahoo bank *loses* both reserves and deposits equal to the amount of the check; the Fourth National Bank *acquires* $50,000 of reserves and deposits. In short, assuming a check is drawn by the borrower for the entire amount of the loan ($50,000) and given to a firm which deposits it in another bank, the Wahoo bank's balance sheet will read as follows *after the check has been cleared against it:*

**BALANCE SHEET 6b: WAHOO BANK** (after a check drawn on the loan has been collected)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Property | $240,000 | Capital stock | $250,000 |
| Reserves* | 10,000 | Demand deposits* | 50,000 |
| Loans | 50,000 | | |

You will note immediately that, after the check has been collected, the Wahoo bank is just barely meeting the legal reserve ratio of 20 per cent. The bank has *no excess reserves.* This poses an interesting question: Could the Wahoo bank have safely lent an amount greater than $50,000—an amount greater than its excess reserves—and still have met the 20 per cent reserve requirement if a check for the full amount of the loan cleared against it? The answer is "No." For example, suppose the Wahoo bank had loaned $55,000 to the Grisley company. Collection of the check against the Wahoo

[7] In transaction 3 demand deposits were created, but only by currency's going out of circulation. Hence, there was a change in the composition of the money supply but no change in the total supply of money.

would want to bear the risk of accumulating such a large sum of money in its safe. But even if it did, the supply of money would still decline by $50,000 when cash repayment was made. In this case, the Grisley company would repurchase its IOU by handing over $50,000 in cash to the bank. This causes loans to fall on the bank's balance sheet by $50,000 and, obviously, cash to increase by $50,000. Remember that we specifically excluded currency held by banks from the money supply on the ground that to include such cash would be double counting; it is apparent that this constitutes a $50,000 reduction in the supply of money. The Wahoo bank would probably use this additional cash either to enhance its reserves so as to permit new lending or to purchase securities.

**Transaction 7: buying government securities.** When a commercial bank buys government bonds[8] from individuals and business concerns, the effect is substantially the same as that of lending. New money is created. To illustrate, let us assume that the Wahoo bank's balance sheet initially stands as it did at the end of transaction 5. Now let us suppose that instead of borrowing all the needed $50,000 from the Wahoo bank, the Grisley company borrows just $25,000 and obtains an additional $25,000 by selling government bonds which it holds to the bank. The Wahoo bank pays for the Grisley company's IOU and the IOUs (bonds) of the government in the same way, by increasing the Grisley company's demand deposit. Demand deposit liabilities increase by $50,000, and the bank's assets of securities and loans increase by $25,000 each. Immediately after negotiating the loan and bond purchase, the Wahoo bank's balance sheet will appear as follows:

**BALANCE SHEET 7a: WAHOO BANK** (when loan is negotiated and bonds purchased)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Property | $240,000 | Capital stock | $250,000 |
| Reserves | 60,000 | Demand deposits* | 100,000 |
| Securities* | 25,000 | | |
| Loans* | 25,000 | | |

The important point is that demand deposits, that is, the supply of money, have been increased by a total of $50,000 as in transaction 6. *Commercial bank bond purchases from the public increase the supply of money in the same way as does lending to the public.* The bank accepts government bonds—which are not money—and gives the Grisley company an increase in its demand deposits—which is money. The only real difference between selling a government bond to a commercial bank and negotiating a loan is that in the first case one gives the banker a claim against someone else (the United States Treasury), and in the second case a claim against one's own assets (one's IOU).

As in transaction 6, the effect of the Grisley company's drawing a $50,000 check in favor of the Quickbuck company will be for the Wahoo bank to lose reserves and demand deposits of $50,000 to the bank in which

[8] Commercial banks are restricted by law in their purchase of private securities. It is felt that banks should be restricted to the performance of recognized banking functions and not permitted to become holding companies or speculative institutions.