


CAMPBELL R. McCONNELL / FIFTH EDITION

State of Pennsylvania

County of Cumberland } SS:

I, Parvin M. Mehrtash, a Notary Public of the State of Pennsylvania hereby certifies that the attached copies are a true, correct, Complete and unaltered original copies made personally by me of the following pages Front Cover, ii, iii, xix, xxix, 289, 294, 295 and 296 copied directly from "Economics" Fifth Edition, written by Campbell R. McConnell Ph.D., Professor of Economics, University of Nebraska-Lincoln: ISBN 07-044893-0.

In Witness Whereof, I have hereunto set my hand and official seal this

03-06-2013

Common Wealth of PA
NOTARIAL SEAL
Parvin M. Mehrtash, Notary Public
Upper Allen Twp., Cumberland County
My Commission Expires March 07, 2016

Parvin M. Mehrtash

Parvin M. Mehrtash, Notary Public

# ECONOMICS

## PRINCIPLES, PROBLEMS, AND POLICIES

McGRAW-HILL BOOK COMPANY

NEW YORK ST. LOUIS SAN FRANCISCO DÜSSELDORF
JOHANNESBURG KUALA LUMPUR LONDON MEXICO
MONTREAL NEW DELHI PANAMA RIO DE JANEIRO
SINGAPORE SYDNEY TORONTO

ii

**ECONOMICS**

Copyright © 1960, 1963, 1966, 1969, 1972 by McGraw-Hill, Inc. All rights reserved. Printed in the United States of America. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher.

*Library of Congress Catalog Card Number* 75-37867

07-044893-0

1 2 3 4 5 6 7 8 9 0 DODO 7 9 8 7 6 5 4 3 2

This book was set in Vega Light by York Graphic Services, Inc., and printed and bound by R. R. Donnelley & Sons Company. The designer was Betty Binns; the drawings were revised by B. Handelman Associates, Inc. The editors were Jack R. Crutchfield, Michael Elia, and Edwin Hanson. Robert R. Laffler and Matt Martino supervised production.

# PREFACE

The fifth edition of *Economics* embodies a very substantial revision and thereby contributes significantly to the metamorphosis which this book has experienced since its publication in 1960. Although the fifth edition bears only a modest resemblance to the first, the basic purpose remains the same: to introduce the beginning economics student to those principles essential to an understanding of fundamental economic problems and the policy alternatives society may utilize to contend with these problems. It is hoped that the ability to reason accurately and objectively about economic matters and the development of a lasting interest in economics will be two valuable by-products of this basic objective. Furthermore, my intention remains that of presenting the principles and problems of economics in a straightforward, logical fashion. To this end great stress has been put upon clarity of presentation and organization.

## THE FIFTH EDITION

This edition incorporates many changes; some of the more significant ones are summarized here in order of descending importance.

First, two new chapters have been added. Chapter 37 is on urban economics. Although it is problem-oriented and deals with such questions as urban sprawl, transportation, the ghettos, urban renewal, and pollution, the chapter is built upon the framework of the economics of agglomeration. My goal is to explain, rather than merely assert, the problems of the cities. Chapter 40 discusses the economics of the war industry, hopefully in a balanced and unemotional way. Student interest in both of these subjects is quite intense, and I have tried to take full advantage of the many opportunities to apply both micro- and macroanalysis.

My *Instructor's Manual* includes some comments of a pedagogical character and, more important, is a reservoir of objective and essay questions.

The *Test File* of questions which was introduced with the fourth edition is available in a slightly enlarged form. The file contains the multiple-choice questions from the *Instructor's Manual* which can be arranged in any desired sequence and efficiently employed in constructing an examination. The *Test File* was received most enthusiastically by adopters of the fourth edition, but somewhat less ecstatically by the publisher, who provides the *File* without charge to users of *Economics*. I am particularly pleased that other authors have accorded the *Test File* the most sincere form of flattery.

Both color and black-and-white transparencies for overhead projectors accompany the text.

**DEBTS**

It has been more than a decade since the first edition of *Economics* was published. Its acceptance, which was most generous from the start, has expanded with each edition. An important by-product of this widespread acceptance is that many teachers and students have been kind enough to give me the benefit of their criticisms and suggestions.

I must restate my debt to the reviewers of the original manuscript: L. S. Van Scoyoc of Bowling Green State University, John Auten of Rice Institute, J. J. Kaufman of Pennsylvania State University, Raymond W. Ritland of Auburn University, and Howell E. Jones of Bethany College. I owe a special debt to Prof. Arthur M. Okun of The Brookings Institution, who contributed much to both the content and organization of this text.

The second and third editions benefited from the counsel and criticisms of Professors Clayton Hall and Fred Picard of Ohio University, David G. Brown of the University of North Carolina, Carl Stern of Randolph-Macon, Kenneth O. Alexander of Michigan Technical University, James M. Cahill of Manhattan College, Ira Castles of Delta State College, Edward Coen of the University of Minnesota, Kalman Goldberg of Bradley University, Keith D. Evans of San Fernando Valley State College, Will Lyons of Franklin and Marshall College, Ray Marshall of the University of Texas, Glenn L. Simpson of Colorado State University, Janet L. Weston of the University of Illinois, and Simon N. Whitney of Rutgers University.

Many of the changes embodied in the fourth edition reflect the wisdom of Professors Donald C. Darnton of Virginia Polytechnic Institute, Robert P. Fairbanks of Northern Illinois University, E. C. Griffith of Washington and Lee University, John P. Henderson of Michigan State University, Richard J. Kiesewetter of American River College, Edward Kittrell of Northern Illinois University, George Powell of Pennsylvania Military College, and Jack W. Skeels of Northern Illinois University.

Perceptive reviews by Ira C. Castles of Delta State College, Frank J. Bonello and Frank J. Jones of Notre Dame, John W. Dorsey of Maryland, and Robert Horton of Purdue were invaluable in preparing the present edition. Kenneth E. Boulding of Colorado and Murray L. Weidenbaum of Washington University contributed instructive reviews of the new chapter on the war industry. Charles Lamphear of Nebraska, Hugh O. Nourse of Illinois, Robert J. Saunders of Kent State, and Douglas M. Brown of Northeastern provided most helpful reviews of the new chapter on urban economics.

Through all five editions I have unashamedly exploited the brainpower of a number of present and former University of Nebraska colleagues, including Robert C. Bingham, Wallace C. Peterson, Clemens B. Thoman, Ernst W. Kuhn, and Harry M. Trebing. Last, but not least, my daughter Lauren provided ample cheap labor in preparation of the index.

It is obvious that in a very real sense "my" book has become a collective endeavor. But, as tradition demands, I accept sole responsibility for all errors of omission and commission.

CAMPBELL R. McCONNELL

Transaction 3: Accepting deposits We have already emphasized that commercial banks have two basic functions: to accept deposits of money and to make loans. Now that our bank is in operation, let us suppose that the citizens of Wahoo decide to deposit some $100,000 in the Merchants and Farmers Bank. What happens to the bank's balance sheet?

The bank receives cash, which we have already noted is an asset to the bank. Suppose this money is placed in the bank in the form of demand deposits (checking accounts), rather than time deposits (savings accounts). These newly created demand deposits constitute claims which depositors have against the assets of the Wahoo bank. Thus the depositing of money in the bank creates a new liability account—demand deposits. The bank's balance sheet now looks like this:

BALANCE SHEET 3: WAHOO BANK

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Cash* | $110,000 | Capital stock | $250,000 |
| Property | 240,000 | Demand deposits* | 100,000 |

You should note that, although there is no change in the total supply of money, a change in the composition of the economy's money supply has occurred as a result of transaction 3. Bank money, or demand deposits, have *increased* by $100,000 and currency in circulation has *decreased* by $100,000. Currency held by a bank, you will recall, is not considered to be a part of the economy's money supply.

It is obvious that a withdrawal of cash will reduce the bank's demand deposit liabilities and its holdings of cash by the amount of the withdrawal. This, too, changes the composition, but not the total supply, of money.

Transaction 4: Joining the Federal Reserve System Being a state bank, the Merchants and Farmers Bank of Wahoo will have the option of joining or not joining the Federal Reserve System. Suppose the directors of the bank decide in favor of joining. To accomplish this, the bank must meet a very specific requirement: It must keep a *legal reserve deposit* in the Federal Reserve Bank of its particular district.

This legal reserve deposit is *an amount of cash equal to a specified percentage of its own deposit liabilities which a member bank must keep on deposit with the Federal Reserve Bank in its district.* Since 1960 banks have been permitted to count vault cash as a part of reserves. As a matter of banking practice, however, the vast bulk of bank reserves are in the form of deposits in the Federal Reserve Banks. We shall simplify our discussion by supposing that our bank keeps its legal reserve *entirely* in the form of deposits in the Federal Reserve Bank of its district.

The "specified percentage" of its deposit liabilities which the commercial bank must deposit in the central bank is known as the *reserve ratio.* Why? Because that is exactly what it is—a ratio between the size of the deposits which the commercial bank must keep in the Federal Reserve Bank and the commercial bank's own outstanding deposit liabilities. This ratio is as follows:

$$\text{Reserve ratio} = \frac{\text{commercial bank's required deposit in Federal Reserve Bank}}{\text{commercial bank's demand-deposit liabilities}}$$

Hence, if the reserve ratio were 10 percent, our bank, having accepted $100,000 in deposits from the public, would be obligated to keep $10,000 as a deposit, or reserve, in the Federal Reserve Bank in Kansas City. If the ratio were 20 percent, $20,000 would have to be deposited in the Federal Reserve Bank. If 50 percent, $50,000, and so forth.

How is the exact size of the reserve ratio determined? Congress has the responsibility for setting the upper and lower limits within which the ratio may vary. These legal limits differ, depending upon the size and location of commercial banks, as Table 17·1 indicates. The Board of Governors can vary the ratio at its discretion within these limits.[1] To avoid a lot of messy computations, we shall suppose that the reserve ratio for all banks is 20 percent. This is a

[1]State nonmember banks are required by state laws to keep reserves. These reserves usually take the form of cash and deposits in other commercial banks. Though the reserve ratio varies considerably among the states, 15 percent is about the average.

This transaction indicates the manner in which commercial banks acquire the bulk of their reserves and deposits: from other banks through the check clearing process. While most of us in our personal dealings with banks think of demand deposits as being created by customer deposits of currency, and of reserves arising as the result of the bank's redepositing some of this currency with the Federal Reserve Banks, this is not actually the case. Most bank deposits and reserves are received from other banks in the way the Beaver Crossing bank has acquired new reserves and deposits in the present transaction.

Transaction 5 is obviously reversible. If a check drawn against another bank is deposited in the Wahoo bank, the Wahoo bank will receive both reserves and deposits equal to the amount of the check as it is collected.

Let us designate here some of the salient conclusions from the first five transactions we have analyzed:

1. When a bank accepts deposits of cash, the composition of the money supply is changed, but the total supply of money is not altered.

2. Commercial banks which are members of the Federal Reserve System are required to keep legal reserve deposits, or simply "reserves," equal to a specified percentage of their own deposit liabilities on deposit with the Federal Reserve Bank of their district. The reserve ratio indicates the size of this "specified percentage." Reserves are a means by which the monetary authorities can control the lending policies of commercial banks. They do this by varying the percentage required as reserves.

3. The amount by which a bank's actual reserves exceed its required reserves is called "excess reserves."

4. Commercial bank reserves are an asset to the commercial bank but a liability to the Federal Reserve Bank holding them.

5. A bank which has a check drawn and collected against it will lose both reserves and deposits equal to the value of the check to the bank receiving the check.

**Money-creating transactions of a commercial bank**

The next two transactions are particularly crucial because they explain how a single commercial bank can literally create money by making loans to, and by purchasing government bonds from, individuals and businesses. Though these transactions are similar in many respects, we treat them separately.

Transaction 6: Granting a loan You will recall that in addition to accepting deposits, a basic function of commercial banks is the granting of loans to borrowers. What effect does commercial bank lending have upon the balance sheet of a commercial bank?

Suppose that the Grisley Meat Packing Company of Wahoo decides that the time is ripe to expand its facilities. Suppose, too, that the company needs exactly $50,000—which, by some unexplained coincidence, just happens to be equal to the Wahoo bank's excess reserves—to finance this project.

The company approaches the Wahoo bank and requests a loan for this amount. The Wahoo bank is acquainted with the Grisley company's fine reputation and financial soundness and is convinced of its ability to repay the loan. So the loan is granted. The president of the Grisley company hands a promissory note—a high-class IOU—to the Wahoo bank. The Grisley company, like all other modern firms, is interested in paying its obligations by check. Hence, instead of receiving a bushel basket full of cash from the bank, the Grisley company will simply get a $50,000 increase in its demand deposit in the Wahoo bank. From the Wahoo bank's standpoint it has purchased an interest-earning asset (the promissory note) and has created demand deposits to pay for this asset.

In short, the Grisley company has swapped an IOU for the right to draw an additional $50,000 worth of checks against its demand deposit in the Wahoo bank. Both parties are pleased with themselves. The Wahoo bank now possesses a new asset—an interest-bearing promissory note which it happily files under the general heading of "Loans." The Grisley

company, sporting a fattened demand deposit, is now in a position to expand its operations.

*At the moment the loan is negotiated,* the balance sheet of the Wahoo bank looks like this:

BALANCE SHEET 6a: WAHOO BANK (*when loan is negotiated*)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Property | $240,000 | Capital stock | $250,000 |
| Reserves | 60,000 | Demand deposits* | 100,000 |
| Loans* | 50,000 | | |

All this looks innocent enough. But a closer examination of the Wahoo bank's balance statement will reveal a startling fact: *When a bank makes loans, it creates money.* The president of the Grisley company went to the bank with something which is not money—his IOU—and walked out with something that is money—a demand deposit.[6] When banks lend, they create demand deposits which are money. By extending credit the Wahoo bank has "monetized" an IOU. The Grisley company and the Wahoo bank have created and then swapped claims. The claim created by the Grisley company and given to the bank is not money; an individual's IOU is not generally acceptable as a medium of exchange. But the claim created by the bank and given to the Grisley company is money; checks drawn against a demand deposit are acceptable as a medium of exchange. It is through the extension of credit by commercial banks that the bulk of the money used in our economy is created.

But there are important forces which circumscribe the ability of a commercial bank to create demand deposits—that is, "bank money"—by lending. In the present case, the Wahoo bank can expect the newly created demand deposit of $50,000 to be a very active account. The Grisley company would not borrow $50,000 at, say, 7 or 8 percent for the sheer joy of knowing the funds were available if needed. Let us assume that the Grisley company awards a $50,000 contract to the Quickbuck Construction Company of Omaha. Quickbuck, true to its name, completes the expansion job and is rewarded with a check for $50,000 drawn by the Grisley company against its demand deposit in the Wahoo bank. The Quickbuck company, having its headquarters in Omaha, does not deposit this check back in the Wahoo bank but instead deposits it in the Fourth National Bank of Omaha. The Fourth National Bank now has a $50,000 claim against the Wahoo bank. This check is collected in the manner described in transaction 5. As a result, the Wahoo bank *loses* both reserves and deposits equal to the amount of the check; the Fourth National Bank *acquires* $50,000 of reserves and deposits. In short, assuming a check is drawn by the borrower for the entire amount of the loan ($50,000) and given to a firm which deposits it in another bank, the Wahoo bank's balance sheet will read as follows *after the check has been cleared against it:*

BALANCE SHEET 6b: WAHOO BANK (*after a check drawn on the loan has been collected*)

| Assets | | Liabilities and net worth | |
|---|---|---|---|
| Property | $240,000 | Capital stock | $250,000 |
| Reserves* | 10,000 | Demand deposits* | 50,000 |
| Loans | 50,000 | | |

You will note immediately that, after the check has been collected, the Wahoo bank is just barely meeting the legal reserve ratio of 20 percent. The bank has *no excess reserves.* This poses an interesting question: Could the Wahoo bank have safely lent an amount greater than $50,000—an amount greater than its excess reserves—and still have met the 20 percent reserve requirement if a check for the full amount of the loan cleared against it? The answer

[6] In transaction 3 demand deposits were created, but only by currency going out of circulation. Hence, there was a change in the composition of the money supply but no change in the total supply of money.

is "No." For example, suppose the Wahoo bank had loaned $55,000 to the Grisley company. Collection of the check against the Wahoo bank would have lowered its reserves to $5,000 (equal to $60,000 minus $55,000) and deposits would again stand at $50,000 (equal to $105,000 minus $55,000). The ratio of actual reserves to deposits would now be only $5,000/$50,000, or 10 percent. The Wahoo bank could thus not safely have lent $55,000. By experimenting with other figures in excess of $50,000, the reader will find that the maximum amount which the Wahoo bank could safely lend at the outset of transaction 6 is $50,000. This figure is identical with the amount of excess reserves which the bank had available at the time the loan was negotiated. We can conclude that *a single commercial bank in a multibank banking system can safely lend only dollar for dollar with its initial pre-loan excess reserves.* Why? Because when it lends, it faces the likelihood that checks for the entire amount of the loan may be drawn and cleared against the lending bank. A lending bank can anticipate the loss of reserves to other banks equal to the amount it lends.

There is a qualification to this discussion: When a bank makes a loan, some of the checks drawn by the borrower *may* be redeposited back in the lending bank. To the extent that this happens, the bank is able to lend an amount greater than its excess reserves. You might try this problem: Suppose a bank with $1,000 in excess reserves knows from past experience that for every loan it negotiates, checks drawn on that loan equal to one-tenth of the value of the loan will be redeposited in the bank. Thus, if the bank makes a $100 loan, the borrower promptly draws ten checks for $10 each. Nine of these wind up in other banks. The tenth is redeposited by its recipient in the lending bank. Knowing this in advance, what is the maximum amount this bank can safely lend on the basis of $1,000 of excess reserves?

Now that you are convinced that this credit-creating business can be complicated, let us accept our original conclusion that commercial banks can safely lend dollar for dollar with their excess reserves as being accurate enough for our purposes. It is a pretty good approximate statement of a single commercial bank's credit-creating potential.

If commercial banks create demand deposits—that is, money—when they make loans, it seems logical to inquire whether money is destroyed when the loans are repaid. The answer is "Yes." Using Balance Sheet 6b, let us see what happens when the Grisley company repays the $50,000 it borrowed.

To simplify, we shall (1) suppose that the loan is repaid not in installments but rather in one lump sum three years after the date of negotiation, and (2) ignore interest charges on the loan. Repayment may take two forms. Most likely the Grisley company will write a check for $50,000 against its demand deposit, which presumably has been fattened by extra profits resulting from the company's expanded operations. As a result the Wahoo bank's demand-deposit liabilities decline by $50,000; the Grisley company has given up $50,000 worth of its claim against the bank's assets. In turn the bank will surrender the Grisley company's IOU which it has been patiently holding these many months. The bank and the company have reswapped claims. But the claim given up by the Grisley company is money; the claim it is repurchasing—its IOU—is not. The supply of money has therefore been reduced by $50,000; that amount of demand deposits has been destroyed, unaccompanied by any increase in the money supply elsewhere in the economy. The Grisley company's IOU has been "demonetized." On the Wahoo bank's balance sheet, demand deposits and loans both fall by $50,000. You will note that the decline in demand deposits increases the bank's holdings of excess reserves; this provides the basis for new loans to be made.

The second repayment alternative open to the Grisley company is to repay by cash. It would be very unlikely that the company would want to bear the risk of accumulating such a large sum of money in its safe. But even if it did, the supply of money would still decline by $50,000 when cash repayment was made. In this case, the Grisley company would repurchase its IOU by handing over $50,000 in cash to the bank. This causes loans to fall on the bank's balance sheet by $50,000 and, obviously, cash to